**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WILLIAM P. BABBY, III, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No.  06-552 JJF |
| v. | : | |
| | : | TRIAL BY JURY DEMANDED |
| CITY OF WILMINGTON | : | |
| DEPARTMENT OF POLICE, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S OPENING BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant City of Wilmington Police Department

September 28, 2007

# **TABLE OF CONTENTS**

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR BABBY'S RETALIATION CLAIM
      BECAUSE BABBY CANNOT ESTABLISH A PRIMA FACIE CLAIM UNDER *MCDONNELL*
      *DOUGLAS*, NOR CAN HE REBUT THE CITY'S NON-RETALIATORY JUSTIFICATIONS FOR
      SELECTING ANOTHER CANDIDATE FOR EACH OF HIS EIGHT TRANSFER REQUESTS -
      COUNT I & II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    BABBY'S FAILURE TO ESTABLISH THE PRIMA FACIE CLAIM . . . . . . 5

            1.    LACK OF ADVERSE EMPLOYMENT ACTION . . . . . . . . . . . . . . 5

                  a.    SCHEDULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                  b.    DIFFERENT ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . 8

                  c.    "COLD SHOULDER" TREATMENT BY COLLEAGUES . . 9

            2.    LACK OF A CAUSAL NEXUS BETWEEN THE COMPLAINT ABOUT
                  THEN-SERGEANT WELLS AND THE DENIAL OF BABBY'S EIGHT
                  TRANSFER REQUESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    THE NON-RETALIATORY JUSTIFICATION FOR THE DENIALS OF THE
            TRANSFER REQUESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.   BABBY'S CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
      DEALING IS BARRED BY THE EXCLUSIVITY PROVISIONS OF 19 DEL.C. § 712(b). . 14

III.  THE WILMINGTON POLICE DEPARTMENT IS NOT A JURIDICAL ENTITY THAT HAS THE
      CAPACITY TO BE SUED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## <u>TABLE OF CITATIONS</u>

### Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Baker v. Wilmington Trust Co.*, 320 F. Supp.2d 196 (D.Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bray v. Marriott Hotels*, 110 F.3d 986 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brown v. Pfaff*, 2004 U.S. Dist. LEXIS 3944 (D. Del. Mar. 3, 2004) . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*EEOC v. Rite Aid Corp.*, 2005 U.S. Dist. LEXIS 32898 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . 5

*Fallon v. Meissner*, 2003 U.S.App. Lexis 8277 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Fuentes v. Perskie*, 32 F.3d 759(3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Hicks v. St. Mary's Honor Ctr.*, 509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jamison v. Wilmington Police Dep't*, 2004 WL 2434298 (D. Del. Oct. 12, 2004) . . . . . . . . . . . . . 15, 16

*Jensen v. Potter*, 445 F.3d 444 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Kidd v. MBNA*, 2004 U.S. App. LEXIS 5694 (3d Cir. Mar. 25, 2004) . . . . . . . . . . . . . . . . . . . . . . . 11

*McDonnell Douglas Corp. v. Green*, 411 U.S 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Moon v. Delaware River and Bay Authority*, 2006 U.S. Dist. LEXIS 7101 (D.Del. 2006) . . . . . . . . . 14

*Poland v. Computer Sciences Corp.*, 2005 U.S. Dist. LEXIS 22618 (D.Del. 2005) . . . . . . . . . . . . . . . 7

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rite Aid Corp.*, 2005 U.S. Dist. LEXIS 32898 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Schuster v. Derocili*, 775 A.2d 1029 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Scott v. State of New Jersey*, 2005 U.S.App. LEXIS 15856 (3d Cir. Aug. 1, 2005) . . . . . . . . . . . . . . . 10

*Thomas v. Wilmington Police Dept.* 1994 Del. Super. LEXIS 266 (Del. Super. 1994) . . . . . . . . . 15, 16

*Washington v. Wilmington Police Dept.*, 1995 Del. Super. LEXIS 472, *9 (Del. Super. 1995) . . . . 15, 16

**Statutes**

Federal

42 U.S.C. § 2000e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

State

19 Del.C. § 701 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Court Rules**

Fed. R. Civ. P. 17(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff, William Babby, III ("Babby"), filed this civil action against his employer, Defendant, Wilmington Police Department ("the WPD"), alleging that the WPD retaliated against him for complaining about a co-worker's remarks during a work-related seminar. This claim arises from the anti-retaliation provisions of Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e. In addition, Babby alleges that the WPD breached the implied covenant of good faith and fair dealing.

Discovery consisted of Babby's deposition, as well as exchanges of interrogatories and requests for production. This is the WPD's Opening Brief in support of its Motion for Summary Judgment.

## SUMMARY OF ARGUMENTS

1.      The WPD is entitled to judgment as a matter of law on the retaliation claim because (1) Babby has not identified any adverse employment action that would establish retaliation, (2) Babby has not established a causal nexus between his protected activity and the allegedly adverse action, and (3) Babby cannot rebut the WPD's non-retaliatory reasons for the personnel decisions that he perceives as retaliatory.

2.      The WPD is entitled to judgment as a matter of law on the claim of breach of the implied covenant of good faith and fair dealing, because it is preempted by the exclusivity provision of the Delaware Discrimination in Employment Act ("DDEA").

3.      The WPD is not a juridical entity that has the capacity to be sued under Rule 17(b).

## STATEMENT OF FACTS

Babby has been employed as a Wilmington police officer since 1989. (Pltf's Cmpl. ¶5) As of early 2001, Babby worked in the patrol division, but he was given the temporary assignment of extra duty job officer in the WPD's Human Resources Division. (Babby at A18) This assignment arose when his colleague, Jack Lucey, had to take disability leave while recovering from a work-related injury. (Babby at A18-19) When Lucey eventually returned to his position, Babby returned to his patrol duties. Babby perceives his return to patrol duties as a "demotion". (Pltf's Cmpl. ¶53(d))

Around that same time, the WPD was planning to create a crime-free housing unit, pending available funds from City Council. (Cummings Aff. ¶3 at A81) Sergeant William Wells ("Wells") was going to supervise this unit, and Captain Bobby Cummings ("Cummings") would oversee Wells in this unit. Babby would have been assigned to this unit, along with Alfred Izquierdo and Tashawn Counts. City Council never did allot funds in the annual operating budget for the crime-free housing unit, and so the unit never became operational. (Cummings Aff. ¶4 at A81)

In May of 2001, while the unit was still in the planning stages, Babby, Wells, Izquierdo and Counts, attended a seminar on non-discrimination in housing. (Babby at A24) According to Babby, during a break at the seminar, Wells made a comment about Hispanics that Babby found offensive. (Babby at A25) According to Babby, Wells said: "All Puerto Ricans have low riders and dice hanging from their mirrors." (Babby at A25) Babby and Izquierdo complained to Cummings about Wells's alleged comment. (Babby at A26) Cummings investigated the complaint and ultimately issued a written reprimand to Wells. (Babby at A29)

Meanwhile, because no funding was allotted for a crime-free housing unit, Cummings could only assign one officer to crime-free housing duties, instead of a unit of three officers. (Cummings Aff. ¶5 - A81) Cummings selected Officer Counts for those duties. (Cummings Aff. ¶5 - A81) Babby returned to his regular patrol duties. Although Cummings sided with Babby in his complaint about Wells, Babby nonetheless

contends that Cummings selected Counts as a way of retaliating against Babby for lodging the complaint. (Pltf's. Cmpl. ¶53(b))

From 2002 until the filing of this lawsuit, Babby applied for the following seven other transfers: (1) the Criminal Investigation Division on February 21, 2002, and May 10, 2004, (2) the Evidence Detection Unit on July 4, 2005, and September 19, 2005, (3) the School Resources Officer on August 21, 2005, (4) the Sector Specialist in the Special Operations Division on December 1, 2005, and (5) the Traffic Division on March 10, 2007. Babby was one of several officers who applied for each of these transfers. (A76 to 78) Wells did not have any hiring authority with regard to these transfers. (See Wells Aff. ¶ 5 at A84) Babby contends that he was denied these transfers in retaliation for lodging a complaint against Wells. (Pltf's. Cmpl. ¶53(a)) When asked to identify which officer was selected for each of these transfers, Babby admitted that he does not know who was selected. (A76-78) Babby simply assumes that if he was not selected, it must be in retaliation for his complaint about Wells, even though Wells had no input or authority in those hiring decisions.

**ARGUMENT**

The City is entitled to judgment as a matter of law on all counts in Babby's Complaint.  First, the retaliation claims in Counts I and II must fail because Babby has not identified any adverse employment action, or a causal nexus to his protected activity of lodging a complaint against Wells.  Even if he had, the retaliation claim would still fail because Babby cannot rebut the WPD's non-retaliatory reasons for selecting other candidates for transfers that Babby sought.  Second, the claim of breach of the implied covenant of good faith and fair dealing is barred by the exclusivity provisions of the Delaware Discrimination in Employment Act ("DDEA").

Because there are no genuine issues of any material facts, the City is entitled to summary judgment on all counts. An issue is only genuine when "a reasonable jury could possibly find in favor of the non-moving party with regard to that issue." *See EEOC v. Rite Aid Corp.*, 2005 U.S. Dist. LEXIS 32898,*2 (D. Del. 2005)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). A fact is only material if it affects the outcome of the lawsuit. *Id.* (citing *Anderson,* 477 U.S. at 248).  This court has consistently reaffirmed that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Rite Aid Corp.,* 2005 U.S. Dist. LEXIS 32898, *1-2 (D. Del. 2005)(quoting Fed. R. Civ. P. 56(c)).  To overcome summary judgment, the non-movant "must demonstrate the existence of a material fact supplying sufficient evidence – not mere allegations – for a reasonable jury to find for the non-movant." *See Poland v. Computer Sciences Corp.,* 2005 U.S. Dist. LEXIS 22618, *2 (D.Del. 2005).  Babby's failure to meet this burden necessitates summary judgment for the WPD.

I.    THE CITY IS ENTITLED TO SUMMARY JUDGMENT FOR BABBY'S RETALIATION CLAIM
      BECAUSE BABBY CANNOT ESTABLISH A PRIMA FACIE CLAIM UNDER *MCDONNELL
      DOUGLAS*, NOR CAN HE REBUT THE CITY'S NON-RETALIATORY JUSTIFICATIONS FOR
      SELECTING ANOTHER CANDIDATE FOR EACH OF HIS EIGHT TRANSFER REQUESTS -
      COUNT I & II

Babby's retaliation claim is that he made eight different transfer requests, and each request was

denied purportedly because Babby complained about his co-worker, Wells. This claim fails because Babby

cannot meet the tripartite *McDonnell Douglas* burden of proof. *See McDonnell Douglas Corp. v. Green*, 411

U.S 792, 802 (1973). *McDonnell Douglas* imposes three prongs upon the employee for a prima facie case

of retaliation: (1) the employee engaged in protected activity; (2) the employer took an adverse employment

action against the employee; and (3) there is a causal nexus between the protected activity and the adverse

employment action. *Id.*  "Whether [the employee] has established a prima facie case of retaliation is a

question of law for the court." *See Baker v. Wilmington Trust Co.*, 320 F. Supp.2d 196, 200 (D.Del. 2004).

If a retaliation plaintiff satisfies these three prima facie prongs (which Babby cannot), the employer

must then demonstrate "a legitimate, non-discriminatory reason" for the employment action. *McDonnell

Douglas*, 411 U.S. at 799. Once the employer proffers a non-discriminatory reason, the ultimate burden

shifts back to the employee, who is then obligated to disprove the employer's proffered justification. *Id.*

A.    BABBY'S FAILURE TO ESTABLISH THE PRIMA FACIE CLAIM

Assuming that Babby's complaint about Wells constitutes a protected activity under *McDonnell

Douglas*, the retaliation claim nonetheless fails because denying Babby's eight transfer requests does not

constitute an adverse employment action, nor is there a causal nexus between Babby's complaint and his

being denied eight transfer requests over the span of six years. In either event, the retaliation claim would

still fail because the WPD has a non-retaliatory reasons for denying those requests.

1.    LACK OF ADVERSE EMPLOYMENT ACTION

To establish an adverse employment action for the second prong of *McDonnell Douglas*, Babby

alleges that he was denied various promotions and transfer requests despite his qualifications.[8] (Pltf's Cmpl. ¶¶ 53(a) & 58)  In his interrogatory responses, Babby specifically cites the following eight different transfer requests that were not granted (A76-78):

> (1) the Crime-Free Housing Division in May of 2001,
>
> (2) the Criminal Investigation Division on February 21, 2002,
>
> (3) the Criminal Investigation Division on May 10, 2004,
>
> (4) the Evidence Detection Unit on July 4, 2005,
>
> (5) the School Resources Officer Position on August 21, 2005,
>
> (6) the Evidence Detection Unit on September 19, 2005,
>
> (7) the Sector Specialist Position in the Special Operations Division on December 1, 2005, and
>
> (8) the Traffic Division on March 10, 2007.

Babby admits that none of these transfers would have given him an increase in pay. (A76 -78) Yet, Babby claims that he would have preferred these jobs over his patrol assignment.  (A78)  Though Babby may be unhappy that these transfer requests were not granted, this court has recognized, that "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."  *Poland v. Computer Sciences Corp.,* 2005 U.S. Dist. LEXIS 22618, *18-19 (D. Del. 2005)(quotation omitted)  For the second prong of *McDonnell Douglas*, "retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *See Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005).

---

[8]Count I is a retaliation claim in which Babby alleges that he was denied promotions and/or transfer requests despite his qualifications. (Pltf's Cmpl. ¶ 53(a))  Count II is a retaliation claim in which Babby alleges that he was "denied career advancement opportunities by denying his requests for transfers in addition to opportunities for promotion in rank."  Thus, Counts I and II appear to be the same claim.  (Pltf's Cmpl. ¶ 58)    For that reason, Section I of this Opening Brief will address Counts I and II as one claim.

The terms, conditions, compensation and privileges of Babby's employment remain unchanged since his 2001 complaint against Wells. (A76-78) "A purely lateral transfer that . . . does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1301 (3d Cir. 1997)(quotation omitted). In Babby's case, he was not even transferred. He remained assigned to the patrol division before and after his complaint about Wells. Babby claims that remaining in the patrol division is an adverse employment action because a transfer would have entailed (a.) a better schedule, (b.) different work assignments than patrol duties, and (c.) cessation of the "cold shoulder" treatment by his co-workers. For the reasons below, none of these preferences establishes an adverse action for the second prong of *McDonnell Douglas*.

a.    Scheduling

Babby does not claim that his schedule changed upon lodging his complaint about Wells. Instead, Babby contends that he would have preferred a schedule where he did not have to work evenings and weekends. (I.G. Response 2 at A78) Yet, Babby concedes that a police department operates twenty-four hours a day, seven days a week. (Babby at A35) A career in law enforcement necessarily requires non-traditional hours that must include evenings and weekends. Babby admits that Sergeants, Lieutenants and Captains are also required to work on evenings and weekends. (Babby at A35) No matter what rank a law enforcement officer achieves, non-traditional evening and weekend work hours will always be a component of the job. (Babby at A35-36) According to *Fallon v. Meissner*, 2003 U.S.App. Lexis 8277, *9-10 (3d Cir. 2003),"a materially adverse employment action . . . must be adverse in the right way [in that] it must not arise from the employee's individual preferences." Thus, WPD's failure to accommodate Babby's preference for bankers' hours is not adverse employment action for the second prong of *McDonnell Douglas*.

b.    Different Assignment

Aside from work schedules, Babby also contends that the transfers would have given him an opportunity to obtain new skills and experience that he could parlay into other employment opportunities

upon retiring from the WPD. (A59-60)  A transfer request is simply a request, and nothing more.  Several of Babby's fellow officers submitted requests for the same transfer. (A 94 to 99)  An employer is not obligated to honor each and every transfer request that an employee submits.  In Babby's case, he was seeking purely lateral transfers, not promotions. (Babby at A35-36)  His rank and pay would have been the same whether he continued his patrol duties or transferred to any of the eight positions that he sought. (A76-78)

In his Complaint, Babby characterized his patrol assignments as a "demotion". (Pltf's Cmpl. ¶53(d))  In his deposition, he elaborated that he believes patrol work is a demotion for him because he worked as the extra-duty job officer  in the Human Resources Division of the WPD.   (Babby at A21)  Upon further questioning, Babby conceded that he was only filling in as the extra-duty job officer while his colleague, Jack Lucey, was out on leave. (Babby at A19-20)  When Lucey returned from disability leave, he resumed his job as extra-duty officer. (Babby at A19)   Thus, the extra duty job officer was never a permanent assignment for Babby.  It was a temporary assignment outside of his patrol duties until the permanent extra duty job officer resumed his assignment.   That is why Babby's return to patrol from that temporary assignment cannot accurately be characterized as a demotion for the second prong of *McDonnell Douglas*.

### c.     "Cold Shoulder" Treatment by Colleagues

Babby also attempts to meet the second prong of *McDonnell Douglas* by citing various incidents of "cold shoulder treatment".  For example, Babby complains that Wells refused to say hello to him in the police parking lot or in the elevator. (A79)  Babby also complains that Wells refuses to acknowledge him when they exercise at the same gym. (A79)  Even if these allegations are true, they do not constitute adverse actions for a retaliation claim.  As the Third Circuit explained in *Jensen v. Potter*, 445 F.3d 444 (3d Cir. 2006):

> [I]n the retaliation context[,] [w]hen one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable. Sides will be chosen, lines will be drawn, and those who were once the whistleblower's friends may not be so friendly

anymore. But what the statute proscribes is retaliation, not loyalty to an accused co-worker
or a desire to avoid entanglement in workplace[.]

*Id.* at 452 (citations omitted).

Thus, Babby does not satisfy *McDonnell Douglas* simply because Wells does not want to be his friend.
Moreover, Babby cannot blame Wells for denying Babby's transfer requests, as Wells had no hiring authority
for any of those job transfers.  (Wells Aff. ¶5 at A84)

Babby also complains that another supervisor, Lt. Rock (who was not even involved in Babby's
complaint about Wells), threatened to discipline him and described him to others as a "no good piece of shit."
(Pltf's Cmpl ¶ 35) Even if this allegation is true, the Third Circuit has confirmed that "oral reprimands and
derogatory comments do not qualify as adverse employment actions for purposes of establishing a prima
facie case of retaliation." *See Scott v. State of New Jersey*, 2005 U.S.App. LEXIS 15856, *9-10 (3d Cir. Aug.
1, 2005).   In light of *Jensen* and *Scott*, Babby cannot satisfy the second prong of *McDonnell Douglas,* no
matter how many incidents of cold-shoulder treatment he identifies from Wells, Rock or any other co-worker.

2.      LACK OF A CAUSAL NEXUS BETWEEN THE COMPLAINT ABOUT THEN-
SERGEANT WELLS AND THE DENIAL OF BABBY'S TRANSFER
REQUESTS

Assuming *arguendo* that the denial of Babby's transfer requests and/or the cold-shoulder treatment
would be adverse employment actions, Babby still cannot establish the third *McDonnell Douglas* prong,
which require proof of a causal link to Babby's internal complaint about Wells. Most of Babby's transfer
requests were submitted at least three or more years after Babby's complaint about Wells.  (A87 -93) Most
importantly, Wells himself never had any hiring authority for these transfers.  (Wells Aff. ¶5 at A84) Wells
was not even assigned to any of the divisions in which Babby sought to transfer (except for the Special
Operations Division when Babby applied for a transfer in December of 2005, which was four and a half years
after the complaint about Wells).   (Wells Aff. ¶3 at A83)  Babby cannot link Wells to the denial of any of
Babby's transfer requests if Wells had no authority to grant or deny those requests.  That rules out the causal

link for the third prong of *McDonnell Douglas*. *See Kidd v. MBNA,* 2004 U.S. App. LEXIS 5694 (3d Cir. Mar. 25, 2004)(dismissing a retaliation claim when the employee failed to establish the causal link between the internal complaint and the subsequent denial of a transfer request).

     B.      THE NON-RETALIATORY JUSTIFICATION FOR THE DENIALS OF THE EIGHT TRANSFER REQUESTS

Even if Babby could meet all three prongs for retaliation (which he cannot), the City has a non-retaliatory justification for selecting someone else for each of the eight transfers. The Third Circuit has held that a retaliation defendant's burden is satisfied "if it introduces evidence which, if taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). "The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763. For the reasons below, there are non-retaliatory justifications for why none of Babby's eight transfer requests was granted.

First, with regard to the transfer to the crime-free housing unit, Captain Cummings could only select on officer, due to budget constraints. Cummings selected officer Counts because, in Cummings's words, "Counts showed concern for working with the public, was an upcoming officer, and I wanted to give him an opportunity to showcase his skill, and I thought he would be good for the position." (Cummings Aff. ¶ 6 - A82)

As for Babby's application to the Criminal Investigation Division ("CID") on February 21, 2002, there were no specific openings in the division at that time. The Police Chief merely issued a general informational bulletin encouraging officers to apply for other specialized divisions that may be of interest, in anticipation of future openings. (A130) That bulletin specifically states: "During the calender year 2002,

-11-

the Department anticipates openings for specialized assignments, agency-wide." (A  )   Thus, the non-retaliatory justification for not granting Babby's transfer request to CID is that there was no specific opening in early 2002.

On May 10, 2004, more than three years after his complaint about Wells, Babby applied for a transfer to the Special Operations Division.  (A87)  Though several other officers requested the same transfer, no one was transferred to that division until late 2005.

On July 4, 2005, Babby and four other officers applied for the position of Evident Room Clerk in the Evidence Detection Unit.  (A85-93)  Among those five officers, only one was selected for that position. (A100-129)

Later in 2005, Babby and eight other officers applied for the position of School Resources Officer. Among those nine officers, only one was selected.  On September 19, 2005, Babby and six other officers (including Robert Curry and David Hillard, both of whom had more seniority than Babby) applied for the position of Evidence Detection Officer in the Evidence Detection Unit.  Among those seven officers, only one was selected for that position.  (A100-129)

Babby also claims that he applied for the position of Sector Specialist in the Special Operations Division on December 1, 2005.  However, the WPD has no record that Babby ever applied for that position.

Most recently, Babby and seven other officers applied for the position of traffic investigator.  Among those eight officers, Master Corporal James Pfeiffer was selected for that position. Ironically, Babby was disciplined for failure to properly investigate a traffic collision, in response to a citizen's complaint.  (Babby at A66)  Yet, Babby claims that he was not selected for this position because he lodged a complaint about Wells six years ago.

For the above-cited transfer requests, there were several officers seeking the same transfer.  Babby's requests were denied because there was only a need for one officer in each of those positions.  When one officer is selected, the other applicants requests must inevitably be denied.  That is the non-retaliatory reason

for denying Babby's transfer requests, along with the request of this colleagues who did <u>not</u> lodge a complaint about Wells.  For example, when Babby's transfer request for the Criminal Investigation Division was denied in 2002, Babby was treated like the other thirty-five of his colleagues whose same request was denied.  In light of these non-retaliatory justifications for each transfer, the burden of persuasion shifts back to Babby.  *See McDonnell Douglas*, 411 U.S. at 802.  Babby cannot meet this ultimate burden without adducing "evidence from which a reasonable fact finder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." *See Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1996).  This burden requires "some evidence, direct or circumstantial, from which a fact finder could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. "This is a more onerous burden of persuasion for a retaliation plaintiff, in that it turns the inquiry 'from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced.'" *Hicks v. St. Mary's Honor Ctr.*, 509 U.S. 502, 516 (1993).

Babby cannot meet this burden of persuasion because the record is devoid of any evidence even suggesting that the City acted in a retaliatory manner.  On the contrary, the record shows that Babby was one of several officers who applied for these transfers.  All but two of these transfer requests were submitted at least three years after Babby's complaint about Wells.  Wells had no hiring authority for these transfer request, and so Wells could not retaliate with regard to those transfers, even if he wanted to.  Babby had a grievance with one former co-worker, Wells, and Babby now blames Wells for everything that he does not like about his job.  Babby cannot cite any evidence that the decision-makers for those eight transfers are somehow denying those requests at the behest of Wells.  As Babby's grievance with Wells is not sufficient to establish the *McDonnell Douglas* burden of proof, the City is entitled to summary judgment for the retaliation claim.

II.    BABBY'S CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS BARRED BY THE EXCLUSIVITY PROVISIONS OF 19 DEL.C. § 712(b).

According to *Moon v. Delaware River and Bay Authority*, 2006 U.S. Dist. LEXIS 7101 (D.Del. 2006), the exclusivity provisions of the Delaware Discrimination in Employment Act ("DDEA"), 19 Del.C. § 701 et seq, preclude an employee from pleading a claim for breach of the implied covenant of good faith and fair dealing.  In July of 2004, that section of the DDEA was amended to state that it "shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies."  *Moon*, 2006 U.S. Dist. LEXIS 7101, *12-13.  In denying such a claim, the *Moon* court emphasized the synopsis of the July 2004 amendments to DDEA:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili*, 775 A.2d 1029 (2001).

*Id.* at *13 (citing Del.G.A., 142nd Sess., S.B. 154)

Accordingly, the current version of DDEA, as applied in *Moon*, necessitates dismissal of Count III of Babby's Complaint.

-14-

III.    THE WILMINGTON POLICE DEPARTMENT IS NOT A JURIDICAL ENTITY THAT HAS THE CAPACITY TO BE SUED

        Babby's claims against the WPD must also be dismissed pursuant to Civil Rule 17(b) for lack of capacity to be sued.  According to Rule 17(b), "capacity to sue or be sued shall be determined by the law of the state in which the district court is held[.]" Delaware state courts have consistently ruled that the Wilmington Police Department is not a separate juridical entity apart from the City of Wilmington, and therefore does not have the capacity to be named as a defendant in a lawsuit.  *See Thomas v. Wilmington Police Dept.* 1994 Del. Super. LEXIS 266 (Del. Super. 1994); *Washington v. Wilmington Police Dept.*, 1995 Del. Super. LEXIS 472, *9 (Del. Super. 1995).

        In *Thomas* , the Delaware Superior Court concluded that the WPD has no separate legal existence apart from the City of Wilmington, based upon a statutory construction of the Wilmington City Charter.  *Id.* at *6.  Specifically, Charter Section 3-100(d) creates eleven departments of the executive branch of City government, one of which is the police department.  As one of eleven executive departments, the WPD has no legal existence apart from the City itself.  *Id.* at *6. Therefore, according to *Thomas*, the WPD does not have the legal capacity to be sued as a defendant in this lawsuit.

        Consistent with *Thomas*, the Delaware Superior Court in *Washington* confirmed that the WPD is not amenable to suit because it is not a separate juridical entity.  *Id.* at *9.  Moreover, the *Washington* court held that the WPD cannot even be a co-defendant when the City itself is named as a defendant. *Id* at. *9.  In so holding, the *Washington* court emphasized and reaffirmed the *Thomas* court's conclusion that "the Wilmington Police Department may not be sued as a separate entity." *Id.* a. *7.  Because Rule 17(b) dictates that the capacity to be sued is determined by the law of the state in which the district court is held, this Court is bound to follow the Delaware state court decisions in *Thomas* and *Washington*.

        In a federal civil rights suit, this Court has recognized that "[a] municipal police department, however, is not a 'person' within the meaning of Section 1983." *See Brown v. Pfaff*, 2004 U.S. Dist. LEXIS 3944,*7 (D. Del. Mar. 3, 2004). *But see Jamison v. Wilmington Police Dep't*, 2004 WL 2434298 (D. Del.

-15-

Oct. 12, 2004)("[T]he defendant police department is a local municipality and, therefore, a person subject to suit for a §1983 violation.").  Though the inconsistent decisions of *Brown* and *Jamison* create a split of authority within this federal district, the *Brown* decision applies because its holding is consistent with *Thomas* and *Washington*, both of which were decided by a court of the state in which this district is held. The *Jamison* decision does not apply because it is inconsistent with the law of the state in which this district is held, and therefore in contravention of Civil Rule 17(b).  Based upon *Thomas*, *Washington,* and *Brown*, the WPD is not amenable to this lawsuit because it is not a separate juridical entity that has the capacity to be sued.

## **CONCLUSION**

For the reasons set forth above, Defendant, Wilmington Police Department, respectfully moves this Honorable Court to grant its motion for summary judgment on all four counts of the Complaint.

                                       /s/ Alex J. Mili, Jr.
                                       Alex J. Mili, Jr., Esquire (I.D. #4125)
                                       Senior Assistant City Solicitor
                                       Louis L. Redding City/County Building
                                       800 N. French Street, 9th Floor
                                       Wilmington, DE 19801
                                       (302) 576-2175
                                       Attorney for Defendant City of Wilmington

September 28, 2007

-17-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WILLIAM P. BABBY, III,                    :
                                          :
            Plaintiff,                    :
                                          :        C.A. No.  06-552 JJF
v.                                        :        TRIAL BY JURY DEMANDED
                                          :
CITY OF WILMINGTON                        :
DEPARTMENT OF POLICE,                     :
                                          :
            Defendants.                   :

**CERTIFICATE OF SERVICE**

    I, Alex J. Mili, Jr., Esquire, hereby certify that on this 28th day of September, 2007, I electronically

filed Defendant's Opening Brief in Support of its Motion for Summary Judgment with the Clerk of Court

using CM/ECF which will send notification of such filing(s) to the following and that these documents are

available for viewing and downloading from CM/ECF:

            Jeffrey K. Martin, Esquire
            Martin & Wilson
            1509 Gilpin Avenue
            Wilmington, DE 19806


                        CITY OF WILMINGTON LAW DEPARTMENT


                         /s/ Alex J. Mili, Jr.
                        Alex J. Mili, Jr., Esquire (I.D. #4125)
                        Senior Assistant City Solicitor
                        Louis L. Redding City/County Building
                        800 N. French Street, 9th Floor
                        Wilmington, DE 19801
                        (302) 576-2175
                        Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM P. BABBY, III, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No.  06-552 JJF |
| v. | : | |
| | : | TRIAL BY JURY DEMANDED |
| CITY OF WILMINGTON | : | |
| DEPARTMENT OF POLICE, | : | |
| | : | |
| Defendant. | : | |

## APPENDIX TO DEFENDANT'S OPENING BRIEF IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant City of Wilmington Police Department

September 28, 2007

## <u>TABLE OF CONTENTS</u>

Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Deposition Transcript of William P. Babby  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-15

Plaintiff's Answers to Defendant's First Interrogatories Directed to Plaintiff . . . . . . . . . . . . . . . . .  A-73

Affidavit of Bobby Cummings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-81

Affidavit of William F. Wells . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-83

Transfer Request Submitted by William Babby  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-85

Human Resource Division Transfer Memoranda  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-94

City of Wilmington Police Chief's Transfer Orders  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-100

City of Wilmington Police Department Agency Wide Transfer Opportunities Memorandum . . . . .  A-130

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM P. BABBY, III, | ) | 06 - 5 5 2 |
| | ) | C.A. NO. |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| CITY OF WILMINGTON | ) | |
| DEPARTMENT OF POLICE, | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT

### PARTIES

1.     Plaintiff, William P. Babby, III (hereinafter "Plaintiff"), has at all times relevant to this Complaint been a resident of New Castle County, State of Delaware, and currently resides at 1613 N. Jackson Street, Wilmington, Delaware 19806. Plaintiff is of Hispanic descent.

2.     Defendant, City of Wilmington Department of Police (hereinafter "Defendant"), is a municipal corporation duly organized and existing under the laws of the State of Delaware, whose registered agent for service of process is the City of Wilmington, Louis L. Redding City/County Building, 800 French Street, 9th Floor, Wilmington, Delaware 19801.

3.     Wilmington Police Department is a division of the City of Wilmington's Department of Public Safety, a city agency, and at all times relevant to this Complaint, the employer of Plaintiff.

### JURISDICTION

A-1

4.     Jurisdiction is founded on the existence of a question arising under federal statutes. This action for injunctive relief and damages is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 200 e *et seq.*, Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000E-(5)(f)(1) and (g). An additional jurisdictional basis for Plaintiff's state law claim exists under the principles of pendant and supplemental jurisdiction and 28 U.S.C. §1367. The state law claim regarding the breach of the implied covenant of good faith and fair dealing is brought pursuant to the pendant jurisdiction of this Court.

## **FACTUAL BACKGROUND**

5.     Plaintiff was hired as a recruit officer on or about January 9, 1989. Plaintiff has been employed with Defendant, City of Wilmington Department of Police, for over seventeen (17) years.

6.     Plaintiff has consistently received standard to superior performance evaluations during his entire time employed with Defendant, Wilmington Police Department, most recently receiving a superior evaluation on or about September 14, 2004.

7.     In or around the year 2000, Plaintiff began working under the supervision of Lieutenant Bobby Cummings in the Human Resources Division after being placed on light duty while recovering from surgery.

8.     While working in the Human Resources Division, Plaintiff filled in for two (2) different positions that were left vacant by other injured officers: the Extra Duty Officer and the Training Officer. Plaintiff handled both of these positions with virtually no training, and was praised numerous times, sometimes on a daily basis, by

A-2

Captain Maggitti and Lieutenant Cummings, for doing an exceptional job fulfilling the duties of these positions. However, when Plaintiff submitted a written request for a permanent transfer to these positions, his request was denied.

9. On or about March 27, 2001, Plaintiff was approached by Cummings who had recently been promoted to Captain and was assigned to the newly-formed Special Operations Division as commander. Cummings asked Plaintiff to put in a transfer request to work in his division as a Crime Free Housing Officer.

10. Plaintiff complied with this request and submitted a one-line transfer request and was accepted into the division without listing any qualifications. Plaintiff was advised that the paperwork was "just a formality" to get him into the division.

11. Plaintiff was transferred into the Special Operations Division along with two (2) junior officers in or around April of 2001.

12. Shortly thereafter, Plaintiff, along with the two (2) junior officers; Officer Izquierdo, an Hispanic officer, and Officer Tshawn Counts, an African-American officer, attended an Equal Housing Conference at the University of Delaware. While at this conference, Sergeant William Wells, a direct supervisor of the three (3) officers, made various racially insensitive and derogatory comments about "Puerto Ricans" and "Mexicans" in the presence of Plaintiff and Officers Izquierdo and Counts.

13. Plaintiff, along with Officers Izquierdo and Counts, approached Captain Cummings about this incident in or about May of 2001 and informed Captain Cummings that Sergeant Wells had made offensive remarks toward Puerto Ricans and Mexicans at the Equal Housing Conference.

A-3

14.    Cummings attempted to dissuade Plaintiff and Officer Izquierdo from filing a formal complaint against Sergeant Wells and suggested they all meet to discuss an attempt to resolve the issue.

15.    The meeting took place later that month, but Plaintiff and Officer Izquierdo were dissatisfied with the outcome and they requested that charges be filed against Sergeant Wells and that he [Wells] be disciplined for his actions.

16.    Shortly thereafter, Officer Counts informed Plaintiff and Officer Izquierdo without any explanation that he no longer wanted to proceed with the complaint against Sergeant Wells.

17.    Plaintiff and Officer Izquierdo filed the complaint against Sergeant Wells which was assigned to Lieutenant Carolyn Henry, a friend of Wells, to investigate.

18.    The investigation took more than four (4) months to complete, and only after Plaintiff and Izquierdo complained to City Personnel about the delay was the investigation concluded.

19.    Plaintiff and Officer Izquierdo were advised that Sergeant Wells was disciplined for his comments.

20.    Sergeant Wells received only a written reprimand for his comments/actions.

21.    Sergeant Wells was subsequently transferred to a position in the Chief's office as the Department spokesperson, while Plaintiff and Officer Izquierdo were demoted and transferred to the Special Operations Division, F Platoon Squad, and assigned to street patrol duties.  Officer Counts, however, who opted not to file the complaint against Sergeant Wells, remained in his position in the Crime Free Housing Division.

A-4

22.  Plaintiff approached Captain Cummings and asked him why Officer Counts was chosen to remain in the Crime Free Housing Division while Plaintiff was assigned to street patrol duty, to which Captain Cummings responded, "Because I am the Captain and he [Counts] is my choice."

23.  In or around June of 2001, Plaintiff was officially assigned to F Platoon under the direction of Captain Marlyn Dietz and Lieutenant Mitchell Rock, both of whom are close friends of Sergeant Wells.

24.  Shortly thereafter, Plaintiff was given an assignment by Lieutenant Rock wherein he was to park his patrol car in the 1200 block of West 6th Street, Wilmington, Delaware, and remain there for eight (8) hours every day with the exception of one (1) break. Plaintiff was advised that the purpose of the assignment was that his presence there would hopefully thwart and/or discourage the sale of drugs in that area by local drug dealers. Plaintiff was also instructed not to enforce any laws or make arrests; that his presence there alone would be enough to curb drug sales in that area. Plaintiff was assigned to this duty for the entire summer of 2001.

25.  Upon his return from vacation in the summer of 2001, Plaintiff was once again assigned to the aforementioned task.

26.  In or around the first week of September of 2001, Plaintiff was called into Lieutenant Rock's office, along with Sergeant Corey Staats. Rock asked Plaintiff what his problem was and why he had not made any arrests or given out any tickets all summer. Plaintiff reminded Rock that he was merely doing as he was instructed by Rock; that he was not to enforce any laws or make any arrests, but was there to curb the drug sales in the area. Rock called Plaintiff a "liar" and told him he had a "bad

A-5

attitude." Rock also called Plaintiff "lazy" and told him that if he "didn't start putting out some numbers, [Rock would] transfer [Plaintiff] back to patrol [duty]."

27.    Shortly after this meeting, Plaintiff and Officer Izquierdo were assigned together for street duty.  At the end of that month, Plaintiff and Officer Izquierdo were the two (2) top producers of arrests and traffic tickets in their division.

28.    In or about October of 2001, Plaintiff was once again called into Lieutenant Rock's office regarding an incident in the rear parking lot of the Department's gas station. While Plaintiff was fueling his patrol vehicle, Lieutenant Rock walked past him, approximately 50-60 feet away, and entered the police staff garage.  Rock said something to Plaintiff, but Plaintiff could not hear him so Plaintiff waved to Rock.

29.    As Plaintiff was pulling out of the lot, Lieutenant Rock summoned him to his office on the police radio.  When Plaintiff responded to Rock's office, Rock asked Plaintiff what his problem was and why he "flipped [him] off."  Plaintiff told Rock he did not flip him off; that he waved to him to acknowledge that he saw him, and told Rock that he could not hear what Rock had said to him.

30.    Rock began shouting at Plaintiff and told Plaintiff that he (Rock) was his (Plaintiff's) boss and a lieutenant and that he (Rock) was free to discipline Plaintiff as he saw fit. Plaintiff told Rock that he did not have a problem with being disciplined if he did something wrong.  Rock then dismissed Plaintiff from his office.

31.    In or around October of 2001, Captain Dietz attended the daily roll call to discuss a new work schedule for F Platoon.  Later that same day, Plaintiff and a few other officers were standing in the House Sergeant's office discussing the new schedule. Captain Dietz entered the room and joined in the discussion with the officers.

A-6

32.    Shortly thereafter, Plaintiff was in the roll call room reviewing the overtime book when he was approached by Captain Dietz. Dietz stated to Plaintiff, "I hear you don't like the new schedule," to which Plaintiff responded in the affirmative, advising Dietz that he and the other officers did not like the new schedule because it was not very convenient to him or the other officers noting that the new schedule severely limited the amount of time they were going to be able to spend with their families. Dietz then left the room without comment.

33.    Later that evening, Plaintiff was called into Lieutenant Rock's office. Rock advised Plaintiff that he was approached by Captain Dietz and was informed that Plaintiff approached Dietz to discuss the new work schedule without going through the proper chain of command. Plaintiff informed Rock that it was actually Dietz who initiated the conversation. Rock informed Plaintiff that the next time he spoke with Captain Dietz without going through the proper chain of command, Rock would write charges up against Plaintiff.

34.    Near the end of October of 2001, Plaintiff was summoned by Captain Cummings and advised that he was being transferred back to the Patrol Division in November. When Plaintiff asked why he was being transferred back to this division, Cummings said that it was out of his hands and that Captain Dietz made the final decision.

35.    Also, in October of 2001, Lieutenant Rock approached Plaintiff's soon-to-be supervisor, Sergeant Morrissey, and advised him that he should watch out for Plaintiff because Plaintiff is a "no good piece of shit."

36.    In or around November of 2001, Plaintiff was transferred back to the Patrol Division and assigned to street duties with E Platoon. While in this division, Plaintiff

A-7

7

submitted a request through the proper chain of command to meet with the Director of Public Safety, James N. Mosely, who maintained an open door policy.

37. In or around December of 2001, Plaintiff was summoned by Captain Dietz who wanted to know why Plaintiff requested to meet with the Director of Public Safety. Plaintiff informed Captain Dietz that it was a personal matter that he only wanted to discuss with the Director of Public Safety.

38. Plaintiff was given permission to meet with the Director of Public Safety; the meeting took place in or around mid-December of 2001. In that meeting, Plaintiff informed the Director that he had been retaliated against for making a complaint against a supervisor and was demoted (transferred back to patrol), despite the fact that he was the senior officer, and most qualified officer, in his previous position.

39. Also during this meeting with the Director, Plaintiff presented a copy of the Department's transfer policy to demonstrate that he was the most qualified individual for the position and, according to policy, should have remained in that position. The Director told Plaintiff that he was not even aware that such a policy existed.

40. The Director also asked Plaintiff what other information he had to support his allegations. Plaintiff informed the Director that a fellow officer could support his claims.

41. The Director advised Plaintiff that he would investigate his allegations and get back to him. Plaintiff has yet to receive a response.

42. Plaintiff submitted a written request for a transfer out of the Patrol Division on or about February 21, 2002 and was once again denied without any supporting explanation.

A-8

43.  Concurrently, while in the Patrol Division under the supervision of Sergeant Michael Morrissey, Plaintiff was nominated for the Kiwanis Award for outstanding work in his division (E Platoon). Only one (1) other officer was nominated for this award.

44.  Sergeant Morrissey informed Plaintiff that he did not receive the award and that Inspector Wright told him to tell Plaintiff, "better luck next time."

45.  From the time Plaintiff initially filed his complaint about Sergeant Wells, he began to experience "the cold-shoulder-treatment" from his superiors. Plaintiff soon found himself shut out by his supervisors; he has been virtually ignored on a daily basis. Plaintiff's superiors have continuously refused to even acknowledge that he is in the room or say hello to him in an elevator. In group conversations, Plaintiff is invariably not even recognized by his supervisors/superiors. Plaintiff has been experiencing the "cold-shoulder-treatment" daily throughout the remainder of 2001, all of 2002, 2003, 2004, and 2005 and this practice continues as of the filing of this action.

46.  On or about May 10, 2004, Plaintiff once again submitted a written request for a transfer out of the Patrol Division. Plaintiff specifically requested to be returned to his day work position in the Special Operations Division. Captain Cummings advised Plaintiff that he was aware of his request and would "see what [he could] do."

47.  Plaintiff requested another transfer in December of 2005 to the position of Sector Specialist in F Platoon. However, his transfer request was subsequently denied.

48.  In total, Plaintiff submitted nine (9) transfer requests since 2002.

49.  Despite a superior evaluation from his immediate supervisor, Plaintiff's request for a transfer has still not been granted as of the filing of this Complaint.

A-9

50.    Thereafter, Plaintiff filed a claim of discrimination simultaneously with the Delaware Department of Labor and the Equal Employment Opportunity Commission (EEOC) against the Wilmington Police Department on the basis of retaliation alleging that after he complained about racial discrimination to the Wilmington Police Department in 2001, he was and continues to be denied promotional opportunities, and continuously scrutinized and harassed by his employer.

51.    The Delaware Department of Labor issued a reasonable cause finding in this matter on February 27, 2006. A copy of the DDOL's Investigative Memorandum received by the undersigned counsel on March 3, 2006 is attached hereto as Exhibit "A".

52.    The United States Department of Justice issued a Right to Sue Letter to Plaintiff on June 5, 2006. A copy of this Right to Sue Letter, received first by the undersigned attorney on June 9, 2006, is attached hereto as Exhibit "B".

## COUNT I
### Retaliation

53.    Defendant intentionally retaliated against Plaintiff for his complaints against a supervisor in violation of  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 200 e *et seq*., Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000E-(5)(f)(1) and (g) when it:

(a) denied Plaintiff promotions and/or transfer requests despite his qualifications;

(b) demoted Plaintiff from the Equal Housing Division to street patrol duties in F Platoon after filing his complaint against Sergeant Wells, a supervisor;

(c) forced Plaintiff to work in a hostile work environment;

(d) demoted Plaintiff once again in November of 2001 back to street patrol duties;

A-10

(e) disciplined and/or threatened to discipline Plaintiff for requesting a meeting with the Director of Public Safety; and,

(f) refused to transfer Plaintiff to the position(s) he requested after his meeting with the Director of Public Safety, despite his qualifications and superior performance evaluations.

54. Defendant acted with retaliatory motive and the reasons provided by Defendants for failing to promote and/or transfer Plaintiff are pretextual.

55. As a direct and proximate result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered, and continues to suffer, a loss of employment opportunities, loss of considerable pay: past, present, future and prospective, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, mental anguish, embarrassment, emotional pain and damages to his reputation.

## COUNT II
### Retaliation – Failure to Promote

56. Plaintiff repeats, re-alleges and incorporates by reference herein paragraphs 1-55.

57. Defendant denied Plaintiff numerous opportunities for career advancement despite his qualifications.

58. Defendant denied Plaintiff career advancement opportunities by denying his requests for transfers in addition to opportunities for promotion in rank.

59. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered, and continues to suffer, a loss of employment opportunities, loss of considerable pay: past, present, future and prospective, loss of other employment

A-11

benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, mental anguish, embarrassment, emotional pain and damages to his reputation.

60.    Defendant's retaliation was willful, wanton and malicious.  As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

61.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

### COUNT III
### Breach of the Covenant of Good Faith and Fair Dealing

62.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 61 of this Complaint by reference as though fully set forth at length herein.

63.    The actions of the Defendant constitute a violation of the Covenant of Good Faith and Fair Dealing implicit in every employment agreement.

64.    Defendant breached the Covenant of Good Faith and Fair Dealing to Plaintiff by failing to promote him and by discriminating against him based upon his race.

65.    Defendant's retaliation was willful, wanton, and malicious.  As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

66.    The above-stated damages were not the result of any act or omission on the part of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Issue a judgment against the Defendant, City of Wilmington Department of Police, and in his favor to provide appropriate back pay with pre-judgment interest, in amounts to be determined at trial, and other affirmative relief

A-12

necessary for damages suffered by Plaintiff and to eradicate the effects of Defendant's actions and unlawful employment practices;

(b) Issue a judgment against the Defendant, City of Wilmington Department of Police, and in his favor ordering Defendants to provide compensation for non-pecuniary losses, including pain, suffering, and humiliation, in amounts to be determined at trial, and other affirmative relief necessary for damages suffered by Plaintiff and to eradicate the effects of Defendant's actions and unlawful employment practices;

(c) Issue a judgment against Defendant, City of Wilmington Department of Police, and in his favor ordering Defendant to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

(d) Issue a judgment against Defendant, City of Wilmington Department of Police , and in his favor ordering Defendant to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

(e) Issue a judgment against City of Wilmington Department of Police, and in his favor ordering the Defendant to pay the costs of reasonable attorneys' fees and expenses; and,

(f) Issue a judgment against Defendant, City of Wilmington Department of Police, and in his favor for damages suffered by Plaintiff as a result of Defendant's actions, including, but not limited to, back pay, front pay, benefits (both retroactively and prospectively), advancement in rank, compensatory damages, punitive damages, attorneys' fees, the cost of this litigation, pre-judgment and

A-13

post-judgment interest and such other relief as this Honorable Court deems just
and proper.

MAROLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Lori A. Brewington, Esquire (#4522)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680 phone
(302) 777-4682 facsimile
Attorneys for Plaintiff William P. Babby, III

Dated:  September 6, 2006

A-14

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WILLIAM P. BABBY, III,                )
                                      )
            Plaintiff;                )
                                      )  Civil Action No.
v.                                    )  06-552
                                      )
CITY OF WILMINGTON,                   )
DEPARTMENT OF POLICE,                 )
                                      )
            Defendant.                )


        Deposition of WILLIAM P. BABBY, III taken
pursuant to notice at the City of Wilmington Law
Department, City/County Building, 9th Floor, 800 North
French Street, Wilmington, Delaware, beginning at
10:00 a.m. on Wednesday, May 30, 2007, before Ann M.
Calligan, Registered Merit Reporter and Notary Public.


APPEARANCES:

            JEFFREY K. MARTIN, Esquire
            MARGOLIS EDELSTEIN
              750 South Madison Street - Suite 102
              Wilmington, Delaware  19801
              on behalf of the Plaintiff;

            ALEX J. MILI, JR., Esquire
            CITY OF WILMINGTON LAW DEPARTMENT
              City/County Building - 9th Floor
              800 North French Street
              Wilmington, Delaware  19801-3537
              on behalf of the Defendant.


                                        A-15

            WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



```
 1    ALSO PRESENT:

 2         WILLIAM TAYLOR

 3         CRYSTAL JOHNSON

 4                    -----

 5              WILLIAM P. BABBY, III,

 6         the witness herein, having first been

 7         duly sworn on oath, was examined and

 8         testified as follows:

 9                    EXAMINATION

10    BY MR. MILI:

11    Q.   Good morning, Mr. Babby.  My name is Alex Mili.

12    We have obviously met before.  I'm the attorney for

13    the Wilmington Police Department in this case.

14              First thing we are going to do is go over

15    exhibit 1.  That's the complaint that's filed on your

16    behalf in this case.  I assume you've seen this

17    complaint at some point?

18    A.   Yes, I have.

19    Q.   Start with paragraph 6, which is on the second

20    page.  It mentions that you have received standard to

21    superior performance evaluations during your entire

22    time with the police department.  Is it also true that

23    you were disciplined on several occasions by the

24    Office of Professional Standards?
```

A-16

William P. Babby, III - Mill

3

1   A.   Yes.

2   Q.   Do you know how many times?

3   A.   No, I don't.

4   Q.   Was it more than ten?

5   A.   I'm not sure.

6   Q.   Was it less than ten?

7   A.   I don't know the exact number, to be honest

8   with you.

9   Q.   If I told you that your penalty log as of now

10   had 18 infractions, would you have any reason to

11   disagree with that?

12   A.   Are we talking from the beginning of my career

13   till now?

14   Q.   Yes.

15   A.   Would I have any reason to disagree?

16   Q.   Yes.

17   A.   No.

18   Q.   Did you also fail the final examination in the

19   police academy?

20   A.   Fail the final examination?

21   Q.   Did you have to retake it?

22   A.   I don't recall.                        A-17

23   Q.   Let's get into the time you spent in the Human

24   Resource Division under Captain Cummings.  I guess he

**W&F**

4

1    was Lieutenant Cummings back then?

2    A.    Yes.

3    Q.    That is in paragraph 8 in the complaint.    Talks

4    about your time working under Lieutenant Cummings.

5    Were you filling in for someone at that time?

6    A.    Yes.    I was filling in for two people,

7    actually.    One for the extra job training officer

8    position, and then I moved from there and went to the

9    training officer position.

10   Q.    Who was the officer that was the extra job

11   officer?

12   A.    I believe at the time it was Kevin Connor.

13   Q.    Do you know why he was away from that job at

14   the time?

15   A.    No.    I don't remember.

16   Q.    Who was the other officer filling in for?

17   A.    Jack Lucey.

18   Q.    Do you know why he was away?

19   A.    I believe he was involved in an automobile

20   accident.

21   Q.    Did both of those officers eventually come back

22   to their jobs?

23   A.    I know Officer Lucey did.    I don't think Kevin

24   Connor did because they transferred at some point --

William F. Babby, III - Mill

5

1    they transferred his responsibility as the extra job

2    officer to Internal Affairs.

3       Q.    When you say transfer to intern affairs, does

4    that mean the job was transferred to Internal Affairs?

5       A.    Yeah.  The job was transferred.  The job

6    initially was in human resources, and I think they

7    moved it to -- well, I know they moved it to Internal

8    Affairs.

9       Q.    And did someone in Internal Affairs start doing

10   that job?

11      A.    Yes.  I believe it was Sergeant O'Connor.

12      Q.    Gerald O'Connor?

13      A.    No.  John O'Connor.  I don't know if it's

14   O'Connor or Connor.

15      Q.    Okay.

16      A.    He's a sergeant.

17      Q.    When Jack Lucey came back to work, you didn't

18   expect to continue in the Human Resources Division,

19   did you?

20      A.    Well, I was told that there were going to be

21   postings for that position, meaning that it was going

22   to be available for anybody to put in for the job.

23      Q.    Would Jack Lucey be taken out of it?

24      A.    That's what I was assuming, if they were going

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-19

6

1   to post the position.

2   Q.   And was Jack Lucey eventually taken out of that

3   job?

4   A.   Not at that time, but yes, he was eventually

5   taken out of the job recently.

6   Q.   How recently?

7   A.   Like I don't know.  Within this year.

8   Q.   2007?

9   A.   Yes.

10   Q.   Let's move to the Crime-Free Housing Division

11   that's mentioned in paragraph 9 of the complaint.

12   Talks about your transfer request to the Special Ops

13   Division and as I understand it -- correct me if I'm

14   wrong -- the Crime-Free Housing Division was part of

15   Special Ops, is that correct?

16   A.   That's correct.

17   Q.   What would have been the work schedule for the

18   Crime-Free Housing Division?

19   A.   We worked a Monday through Friday schedule,

20   either eight to four or nine to five, whichever we

21   preferred to work.

22   Q.   What did the crime-free housing officers do?

23   What was their job?

24   A.   Well, I had training, and they sent me to

7

1    training.  We were going to be responsible for going

2    to housing complexes, apartments, and things of that

3    nature to instruct, I guess, the building owners on

4    the proper way to keep crime from coming into their

5    residences they owned.

6        Q.    How did you learn that the work schedule would

7    be either, you said, eight to four or nine to five

8    Monday through Friday?

9        A.    I didn't learn that until I was transferred

10   into the position.

11       Q.    How did you learn that?

12       A.    I was told by Captain Cummings.

13       Q.    Did the Crime-Free Housing Division become

14   operational as a full-time division?

15       A.    No.

16       Q.    Why not?

17       A.    I didn't find this out till later, but

18   apparently the funding never came through.

19       Q.    So, if the funding never came through and this

20   division never became operational, you couldn't

21   continue to work in that division, could you?

22       A.    No.

23       Q.    Now, continuing on about the Crime-Free Housing

24   Division, paragraph 21 of the complaint says that

William P. Babby, III - Mili

8

1    Tshawn Counts remained in the Crime-Free Housing

2    Division.  Do you think he was qualified to work in

3    the Crime-Free Housing Division at that time?

4    A.    I don't know what his qualifications were, so I

5    can't say yes or no.

6    Q.    Let me ask you this.  Do you think he's less

7    qualified than you to work in that job?

8    A.    Yes, I do believe he is.

9    Q.    Can you tell me why?

10   A.    Well, I had more experience on the department,

11   more training.

12   Q.    Do you know who Alvin Boardley is?

13   A.    Yes, I do.

14   Q.    Is he a patrol officer?

15   A.    He works for something called the G squad right

16   now where they do the WHA housing project.

17   Q.    How long has he been doing that, if you know?

18   A.    I don't know exactly how long.

19   Q.    In 2006 was he doing patrol duties?

20   A.    I don't know.

21   Q.    Do you know who James Ogden is?

22   A.    Yes.

23   Q.    Is he a patrol officer?

24   A.    No.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-22

William F. Babby, III   Mill

9

1    Q.    What is he doing?

2    A.    He holds a rank of master corporal, and he is

3    also working in the G squad unit, WHA housing.

4    Q.    Do you know what he did prior to the G squad?

5    A.    No.

6    Q.    Are you aware of any officers with more than 18

7    years of experience in the police department who are

8    still doing patrol duties?

9    A.    I know one for sure.  That would be Vic

10   Harrison.  He's been probably on the police department

11   for over 30 years.

12   Q.    Any others?

13   A.    With more than 18 years?

14   Q.    Yes.  In other words, with more seniority than

15   you.

16   A.    Yeah, I know a couple.

17   Q.    Do you know the names off the top of your head?

18   A.    Lloyd Staats.  Douglas Baylor.  Other than

19   that, I couldn't give you.

20   Q.    My question is, is it unheard of for someone

21   with 18 years or more of experience to still do patrol

22   duties?

23   A.    No.  It's not unheard of.                    A-23

24   Q.    Let's switch gears and move on to the Sergeant

10

1   Wells incident.  I guess he's lieutenant these days.

2           Paragraph 12 talks about allegation that

3   he made racially insensitive and derogatory comments.

4   Can you tell me specifically what were the comments or

5   comment?

6   A.   To give you specifically what he said, I would

7   have to refer to my complaint.

8   Q.   Oh, you can do that.  Sure.

9   A.   Oh.  Can you give me a minute?

10  Q.   Take your time.

11  A.   Okay.  I'm ready.

12  Q.   Before you refer to it, can you tell me what

13  document you're referring to for the record?

14  A.   Yeah.  It's the copy of my notification of

15  complaint dated 22 August 2001.

16  Q.   Okay.

17  A.   Are you ready?

18  Q.   Yes.

19  A.   While we were waiting for the seminar to start,

20  we were approached by Sergeant Wells who engaged us in

21  general conversation.  While conversing with Wells, he

22  started to talk about the previous evening at Bernie's

23  bar.  He mentioned something about talking to a

24  Spanish girl at the bar.  Wells then apparently told

11

1  the female that another off-duty officer who was also

2  at the bar said, "All Puerto Ricans have low riders

3  and dice hanging from their mirrors."  Wells then

4  laughed briefly and then looked at Izquierdo, and

5  stated, "Puerto Ricans and Mexicans are all alike."

6     Q.  Aside from that comment, are there any other

7  racially insensitive or derogatory comments that you

8  heard from Sergeant Wells during your tenure at the

9  Wilmington Police Department?

10     A.  No.

11     Q.  Can you give me the chain of command at the

12  time of this complaint, starting with yourself all the

13  way up to Cummings?

14     A.  Would have been us.  Wells was our direct

15  supervisor.  Past him would have been Lieutenant Henry

16  and then Captain Cummings.

17     Q.  Do you remember when Captain Cummings became

18  captain in 2001?

19     A.  No, I don't recall specifically.

20     Q.  I'm a little confused myself on that one.  I've

21  seen some inconsistencies in the documents for 2001.

22  That's fine.

23        You said "us."  Are you referring to

24  Officer Alfred Izquierdo?

A-25

William P. Babby, III - Mili

12

1    A.    Can you rephrase the question?

2    Q.    I asked you to give me the chain of command.

3   The first thing you said was "us."

4    A.    Us, yes.  Meaning myself, Izquierdo, and Tshawn

5   Counts.

6    Q.    Continuing along with this, I guess the first

7   question I should ask you, prior to this August 2001

8   document that you just read, had you at some point

9   complained to Captain Cummings prior to writing this

10  document?

11   A.    Yes.

12   Q.    When was that?

13   A.    It would have been in early May.

14   Q.    What specifically was your complaint to him?

15   A.    That I was upset about the remarks that he made

16  at an equal housing conference that we were attending.

17   Q.    Where were you and Captain Cummings when you

18  made this complaint?

19   A.    We were in the office on the second floor in

20  the Special Operations Division.

21   Q.    Who else was with you?

22   A.    Officer Izquierdo and Tshawn Counts.

A-26

23   Q.    Who did all the talking in this complaint?

24   A.    I don't remember exactly who did all the

William F. Babby, III Mill

13

1   talking, but I do remember specifically letting him

2   know that I was, you know, not pleased with what he

3   said.

4       Q.    Now, continuing on with this topic,

5   paragraph 14 which is on the next page, you allege

6   that Captain Cummings tried to dissuade you from

7   filing a formal complaint.  My question to you is,

8   what exactly did he say or do to dissuade you?

9       A.    Well, I remember when we approached him and --

10  I remember when I approached him, and we spoke about

11  Wells' behavior.  I told him that I thought it was

12  inappropriate for a supervisor to be making such

13  comments in the workplace and that I would like to

14  have him put on charges for his comments.  And at that

15  time Cummings said to me, "Well, instead of that, can

16  we do this?"  And do this, I mean, it says in the

17  complaint here we all sat down and had a discussion

18  with Wells about the incident.

19      Q.    So is that what he did to dissuade you, to say,

20  "Let's sit down and talk about it instead of filing

21  charges"?

22      A.    Yes.                                          A-27

23      Q.    But at that time was Captain Cummings in a

24  position to bring charges against Sergeant Wells?

William F. Babby, III    Mill

14

1    A.    As far as I know, yes.

2    Q.    Can any captain bring charges against a

3    subordinate?

4    A.    Any police officer can bring charges up on any

5    police officer, no matter what rank you are.

6    Q.    Let me get clarification on that.  It's my

7    understanding -- and tell me if I'm correct or not --

8    that a captain or any other officer can only make a

9    complaint to the Office of Professional Standards and

10    then the Office of Professional Standards does an

11    investigation and makes a determination whether

12    charges are warranted.  Is that not the way it works?

13    A.    Usually.  But it didn't appear to work that way

14    in this case.

15    Q.    That's what I'm trying to understand.  First of

16    all, was Captain Cummings part of the Office of

17    Professional Standards at that time?

18    A.    No.  He was captain of Special Operations

19    Division.

20    Q.    So what I want to understand is, can he bring

21    charges?  Could he have brought charges against

22    Sergeant Wells without going to the Office of

23    Professional Standards?

24    A.    Well, he did.

A-28

William F. Babby, III - Mill

15

1    Q.    When?

2    A.    At some point -- I don't know exactly when, but

3    apparently, as I was looking through some paperwork,

4    that you supplied to us, I saw a copy of a document

5    that he wrote, that he conducted an investigation and

6    found Wells guilty.

7    Q.    I know.  I see where we are going now.  Okay.

8            Let's get back to paragraph 15, which you

9    told me a moment about ago about this meeting you had

10   with -- you said it was at the Tshawn Counts, Alfred

11   Izquierdo, who they call -- what's his name?  Izzy?

12   A.    Izzy.

13   Q.    You and Captain Cummings.

14           Were you dissatisfied with the outcome of

15   that meeting?

16   A.    Yes.

17   Q.    What happened at that meeting?

18   A.    Well, we -- each officer had the opportunity to

19   speak to Wells directly.  We were all seated at the

20   same table, and he was just very arrogant and

21   standoffish and really didn't care to hear what we had

22   to say.  So I felt that, obviously, this was not going

23   to solve the problem, and I wanted charges brought

24   against Wells for his misconduct.

A-29

1    Q.    In this meeting did you have the opportunity to

2    talk to Wells personally about how you felt?

3    A.    Yes.

4    Q.    And what did you say to him?

5    A.    I don't remember specifically what I said, but

6    I did let him know that I was displeased what with

7    what I heard and I also let him know that, because I'm

8    sure he wasn't aware that I was of Spanish descent, I

9    explained to him that the parents I have now are my

10   adopted parents, and I was -- my biological family is

11   Spanish.   And I told him that I was offended by those

12   remarks.

13   Q.    Do you remember what his response was?

14   A.    He just kind of laughed and didn't really say

15   much.

16   Q.    Did -- call him Izzy.   Did Izzy have a chance

17   to talk to Sergeant Wells in that meeting?

18   A.    Yes.

19   Q.    Do you remember what Izzy said?

20   A.    I don't remember exactly, but I know he was

21   displeased.

22   Q.    Do you remember, if you remember, what Sergeant

23   Wells said in response to whatever Izzy said to him?

24   A.    I don't recall.



17

1    Q.    And other one you said was Tshawn Counts.  Do
2    you remember what Tshawn Counts said, if anything?
3    A.    I don't recall.
4    Q.    Last question on that topic, do you remember
5    what Sergeant Wells said in response to whatever
6    Tshawn Counts may have said?
7    A.    No.  I don't remember.
8    Q.    Paragraph 17 you talk about how this complaint
9    that you ultimately submitted to -- the complaint that
10   you read to me earlier, was that addressed to Captain
11   Cummings?
12   A.    Well, can I look?  I don't remember who I
13   addressed it to.
14   Q.    Oh, yeah.
15   A.    It was addressed to the chief.
16   Q.    Okay.
17   A.    Michael Szczerba.
18   Q.    At some point did Captain Cummings have to
19   investigate this complaint?
20   A.    Yes.
21   Q.    And paragraph 17 is where he mentioned that he
22   turned it over to Carolyn Henry.
23   A.    I was never told directly by anyone that it was
24   turned over to Carolyn Henry.  I just kind of found

William P. Babby, III - Mili

18

1   out.

2    Q.    How did you find out?

3    A.    Because sometime during that summer, myself and

4   Izquierdo were kind of wondering, you know, what was

5   going on with the case because we hadn't heard

6   anything, and we went to Lieutenant Henry's office and

7   asked her if she knew anything about the investigation

8   and she said that she was handling it.  And that's all

9   she said.

10    Q.    Are you aware of whether Captain Cummings was

11   out of the office for an extended period of time in

12   the summer of 2001?

13    A.    Yes.  He went to I believe it was the FBI

14   academy.

15    Q.    Do you know how long he was there?

16    A.    No, I don't recall.

17    Q.    Do you remember if perhaps it was more than a

18   month?

19    A.    It was several months.  I don't know the exact

20   number.

21    Q.    Did you expect Captain Cummings to continue

22   with the investigation of this complaint while he was

23   at the FBI academy?

24    A.    I expected that something be done about it.

19

1    Q.    Did you think there was anything inappropriate

2    about him passing it off to Carolyn Henry while he was

3    aware?

4    A.    Well, I felt kind of discouraged that it would

5    be investigated properly because Lieutenant Henry and

6    Wells are good friends.

7    Q.    Did you not trust Carolyn Henry to put her

8    personal feelings aside and take an objective look at

9    the complaint?

10   A.    No, I did not.

11   Q.    Why not?

12   A.    Like I stated earlier, Lieutenant Wells and

13   Lieutenant Henry were friends.

14   Q.    I understand that, but I guess more my question

15   is, has Carolyn Henry ever done anything in the past

16   to cause you to believe that she would be less than

17   honest in her investigation of this complaint?

18   A.    To me directly, no, but, you know, I didn't

19   feel that her investigating it would have been --

20   would have been fair.

21   Q.    Who would you have wanted to investigate it?

22   A.    I would have preferred the whole incident be

23   investigated by Internal Affairs to be quite honest

24   with you.

A-33

William P. Babby, III - Mili

20

1    Q.   Do you know what Carolyn Henry did at the end

2    of her investigation?

3    A.   I have no idea.

4    Q.   Do you know if Sergeant Wells was disciplined

5    for the incident?

6    A.   Yes.   I did find out that he received a written

7    reprimand.

8    Q.   And were you satisfied that he was disciplined?

9    A.   I didn't think that's appropriate discipline.

10   Q.   What did you think might be appropriate?

11   A.   Perhaps some time off from work or suspension

12   or something of that nature.

13   Q.   Switch gears now.   We are going to go onto a

14   new topic, the transfer to the Special Ops Division of

15   the F platoon.   I think we talked about that in

16   paragraph 1, which is at the bottom of the page you're

17   looking at.

18   A.   Paragraph 1?

19   Q.   Excuse me.   21.

20   A.   Oh, 21.

21   Q.   When this transfer occurred -- first of all, in

22   paragraph 21, you say you were demoted and

23   transferred.   Why do you call it a demotion?

A-34

24   A.   I consider it demotion because, first of all,

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William F. Babby, III - MIFF

21

1    I've been on the police department for a number of

2    years and I haven't had the opportunity to work in any

3    other division where the schedule was more favorable

4    than what -- where I came from, meaning, when you work

5    a patrol schedule, it's weekends and holidays and

6    overnights.  And I was going from that to a day work

7    position.

8      Q.    Let's talk about scheduling for a minute.  The

9    police department is open 24 hours, seven days a week,

10   right?

11     A.    Yes.

12     Q.    Police officers are expected to work evenings,

13   right?

14     A.    At times, yes.

15     Q.    Sergeants work in the evenings, right?

16     A.    Well, some sergeants work evenings, yes.

17     Q.    Do some lieutenants work evenings?

18     A.    Some lieutenants work evenings.

19     Q.    And do some captains work evenings?

20     A.    I believe that some captains do work evenings,

21   although I never see them actually working.  But I

22   have to assume that they are because I hear them.

23     Q.    Do some sergeants work weekends?

24     A.    Some sergeants work weekends.

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

William F. Babby, III - Mili

22

1    Q.    And some lieutenants work weekends, do they

2    not?

3    A.    They do.

4    Q.    Do captains also work weekends?

5    A.    That I'm not 100 percent sure on.

6    Q.    But is it unusual at various ranks in the

7    police department to work evenings and weekends?

8    A.    No.

9    Q.    Let's get off of scheduling now.  Let's talk

10   about getting back to this topic of transfer to

11   Special Ops in the F platoon, did your rate of pay

12   change when you were transferred?

13   A.    No.

14   Q.    In fact, you would have probably gotten a shift

15   differential, right, if you were working in the

16   evenings?

17   A.    Yes.

18   Q.    Did your rank change when you were transferred?

19   A.    No.

20   Q.    Let's move onto the, I guess, meeting with

21   Director Moseley, some background on that.  You

22   mentioned that Director Moseley has an open-door

23   policy about meeting with him?

24   A.    Yes.                                      A-36

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

William P. Babby, III - Mili

23

1    Q.    What is that open-door policy?

2    A.    That, if we had any problems or concerns, as

3    long as we submitted a request through the chain of

4    command, that we could come up and discuss those

5    concerns with him.

6    Q.    When you submit a request through the chain of

7    command, do you have to tell the people in the chain

8    of command what is you're speaking with Director

9    Moseley about?

10   A.    No.  I don't believe so.  I didn't, and I was

11   granted, you know, accessibility to him.

12   Q.    If you have a problem with, for example, a

13   particular supervisor that you want to discuss with

14   Director Moseley, are you expected to tell that

15   particular supervisor beforehand that you are going to

16   talk to Director Moseley about him or her?

17   A.    No.

18   Q.    And you did finally -- you said you were

19   granted a meeting with Director Moseley?

20   A.    Yes.

21   Q.    Where did this meeting take place?

22   A.    It took place in his office.

23   Q.    What was the meeting about?                    A-37

24   A.    The meeting was about me -- well, I came in to

William P. Babby, III - Mili

24

1    tell him, let him know that I felt that I was
2    retaliated against because I made a complaint against
3    a supervisor.
4        Q.   How did you feel you were retaliated against?
5        A.   I was transferred back to the patrol division.
6        Q.   Which platoon?
7        A.   E.
8        Q.   What is it that you didn't like about the
9    E platoon?
10       A.   I didn't want to go back to working shift work,
11   weekends, holidays.  I wanted to have the chance to be
12   able to obtain some other experience throughout the
13   police department.
14       Q.   Did Director Moseley promise you he would do
15   anything about this transfer?
16       A.   What he told me was that -- was that he would
17   look into my allegations and get back to me, and he
18   never did.
19       Q.   When you say allegations, your allegations of
20   retaliation?
21       A.   Yes.
22       Q.   Did he give you a deadline of a certain date
23   that he would get back to you either way?          A-38
24       A.   No.  The only thing he said to me was that he

25

1   would get back to me.

2      Q.    After some time passed, obviously he hasn't

3   gotten back to you, did you follow up with him and

4   say, "Hey, Director.  You promised to get back to me.

5   I didn't hear from you"?

6      A.    I didn't feel it was my responsibility.  He

7   told me he would get up with me.

8      Q.    Did you discuss anything else with Director

9   Moseley in that meeting?

10     A.    Yes, I did.  In fact, I was trying to explain

11  to him why I felt that I should have been kept in the

12  position and not Tshawn Counts, and I gave him a copy

13  of our policy at the time regarding career development

14  and transfers.  And in that policy, it clearly stated

15  that officers with a certain amount of career ladder

16  points were to be given preference over, you know,

17  other officers that didn't have those points.

18     Q.    Is this part of the white book?

19     A.    Yes.

20     Q.    Do you know which directive?

21     A.    Under the exact directive -- I have a copy of

22  it in here somewhere.

A-39

23     Q.    That file?  Take your time.  Don't rush.

24     A.    At the time it was the career development

26

 1   program.

 2   Q.   6.49?

 3   A.   Directive 6.49, and the specific section I'm

 4   referring to is on I guess -- I don't have a page.

 5   Q.   5?

 6   A.   Oh, page 9 -- 5, and I put a little asterisk

 7   here, and it explains what I was trying to tell

 8   Director Moseley.

 9   Q.   Okay.

10   A.   And I did give him a copy of it, and he stated

11   he wasn't aware that we had this policy.

12   Q.   Does Director Moseley make personnel decisions

13   in the police department?

14   A.   I have no idea.

15   Q.   Did you expect him to do anything about this

16   transfer, I guess to undo the transfer to E platoon

17   that you were unhappy with?

18   A.   Well, I had expected him to look into the

19   matter at least, or do something about it, yes.

20   Q.   That's my question.  What did you want him to

21   do?

22   A.   I wanted him to help me out and get me out of

23   patrol division.

A-40

24   Q.   But are you ever aware of any instance where

27

1    Director Moseley himself would get someone out of a

2    particular assignment?

3      A.    I have no way of being able to say that he

4    does.  I don't know.

5      Q.    Shift gears a little bit.  We are going to talk

6    about the promotional process now.  For promotion in

7    police departments, for example, to sergeant, are you

8    required to take an examination?

9      A.    Yes.

10     Q.    How often is that examination given?

11     A.    It's every two years.

12     Q.    Have you ever taken the examination?

13     A.    Yes.

14     Q.    When?

15     A.    I don't remember specifically.  It hasn't been

16   recently.

17     Q.    Would it have been in 2004?

18     A.    I don't -- I don't recall.  If may have been

19   before that.

20     Q.    Could it have been in 2002?

21     A.    It could have been.                    A-41

22     Q.    Are they only given in even numbered years?

23     A.    I don't know specifically how that works.

24     Q.    Did you have any particular promotions that you

William P. Babby, III - Mili

28

1    had aspired to in the police department?

2    A.    Meaning?

3    Q.    When you said you took the promotional --

4    A.    Oh, sergeant, yes.

5    Q.    Now, what we are going to do -- I appreciate

6    you giving me this list of transfers.  We are going to

7    get to this at the end.  We are going to go one by one

8    in reverse chronological order.  The list of

9    transfers, those are starting with documents -- you

10   can you can set aside this complaint for now.  I mean

11   the one on top.

12            How are we doing as far as you wanting a

13   break or wanting to pause or anything?

14   A.    I'm fine.

15   Q.    You want to keep going.  All right.

16   A.    I'm fine.

17   Q.    I don't have your transfer request for the

18   December '05 sector specialist position in the

19   F platoon, but I do know you made such a request.  Was

20   there a vacancy in the F platoon in December of '05

21   when you requested a position?                    A-42

22   A.    Yes, because they announced -- they announced

23   that there was going to be vacancies.

24   Q.    How are these announcements normally made?

William P. Babby, III - Mill

29

1    A.    They come out on the departmental information,

2    addressed to roll calls or -- I'm sorry -- our

3    platoons, and our supervisor disseminates that

4    information to us.

5    Q.    Do you know how many others, if anybody, may

6    have applied for the same position?

7    A.    I don't know.

8    Q.    Was it only one position within the F platoon

9    in this particular division?

10   A.    I believe it was several positions.

11   Q.    You say several.  Do you know how many?

12   A.    More than three.

13   Q.    Were these positions eventually filled?

14   A.    Yes.

15   Q.    Do you know who filled them?

16   A.    No, I don't.

17   Q.    Continuing along in reverse chronological

18   order, the document you have in front of you that

19   looks like your May 10, 2004, transfer.                A-43

20         Now, paragraph 46 of the complaint -- I

21   guess we will get back to it.  I think it's talking

22   about your May 10, 2004, transfer.  Paragraph 46 says

23   you submitted a request for a transfer out of the

24   patrol division into the day work position in Special

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

30

1   Ops.  Was that the May 10, 2004, transfer that we have

2   identified as Babby Exhibit 2?

3       A.    Yes, it is.

4       Q.    Was there a vacancy in Special Ops at that

5   time?

6       A.    I don't recall.

7       Q.    So when you applied for transfer, if there was

8   no vacancy, did you expect the transfer request to be

9   held in abeyance until something came up until

10  something opened?

11      A.    I don't remember specifically if they announced

12  it or -- I don't remember, to be 100 percent honest

13  with you, but I put in the request for a reason.  I

14  don't remember exactly what that reason was.

15      Q.    Have you ever put in transfer requests for

16  positions that weren't necessarily vacant in hopes

17  that perhaps, when they do become vacant, your request

18  will already be in there?

19      A.    Generally I put requests in when they announce

20  that there's a position available.

21      Q.    Do you know if this special operations position

22  that you requested in May of 2004 was eventually

23  filled?

24      A.    I don't know.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-44

William P. Babby, III - Mili

31

1    Q.    Let's go on to exhibit number 3.    That's

2    February of 2002.    That's another Special Ops Division

3    request, is it not?

4    A.    This is for criminal investigation division.

5    Q.    I'm sorry.    That's CID.

6              Same question.    When you filled out this

7    request, were you given notice that there was a

8    particular vacancy in the CID criminal investigation

9    division?

10   A.    As I told you previously, I usually put in a

11   request for transfer when I'm given notification that

12   the position is available.    So I would assume that

13   that's what I did.

14   Q.    And do you know if, whatever position was

15   available, if it was eventually filled?

16   A.    I would assume that it was.

17   Q.    Do you know by who?

18   A.    Off the top of my head, no, I don't.

19   Q.    Continue on.    The next document is the March

20   27 -- that's another Special Ops Division request,

21   right?

A-45

22   A.    Yes.    This is my initial request to be

23   transferred to the Special Operations Division.    As

24   you can see, Captain Cummings signed off on it.    I put

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

32

1    this in at his request.

2       Q.    Specifically in the Special Options Division,

3    were you hoping to get a position in the Crime-Free

4    Housing Division.

5       A.    Yes.

6       Q.    And that never became operational Crime-Free

7    Housing Division, is that correct?

8       A.    It's operational for a short time, and then it

9    was eventually disbanded.

10      Q.    Do you remember when it was disbanded?

11      A.    No.  I don't remember specifically what date it

12   was disbanded.

13      Q.    I don't mean the exact date, but do you

14   remember, for example, was it summer 2001 to fall of

15   2001?

16      A.    No, I don't remember.

17      Q.    Obviously you didn't get this job in Special

18   Ops that you requested, correct?

19      A.    Yes, I did get this.

20      Q.    Oh, you did?                          A-46

21      A.    This was my -- while I was in human resources,

22   Lieutenant Cummings approached me and asked me if I

23   wanted to be considered for a position in Special

24   Operations Division because he was aware that he was

William P. Babby, III - Mili

33

1   being promoted to captain and was going to be taking

2   over that position.  And I said, "Yes, I would like to

3   do that."  And he said, "Write a one-line DI saying

4   that you want to come to Special Operations Division."

5   And that's what I did.  And I was transferred into the

6   position.

7      Q.   For how long?

8      A.   How long was I there?

9      Q.   How long did you work in that position?

10     A.   Till, I want to say, the end of May or the

11  beginning of June is when we were actually put into

12  the F platoon.

13     Q.   And was there a police-department-wide

14  redeployment around that time in June of 2001?

15     A.   I don't recall.

16     Q.   Is there normally a massive redeployment in the

17  summer months, given the crime is higher in the

18  summer?

19     A.   Well, they bring other officers from other

20  divisions, and they start making them work on the

21  street, if that's what you're asking.

22     Q.   Yeah.  Is that accurate?

23     A.   Yes.                                    A-47

24     Q.   Does that happen every summer for as long as

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William P. Babby, III - Mili

34

1  you worked in the police department?

2  A.   Well, it hasn't happened every summer.  It has

3  happened in the past five or six years that I recall.

4  Q.   And I guess, when that happened in the summer

5  of 2001, were you put back on regular patrol?

6  A.   No.  I was told by Captain Cummings that we

7  were going to be moved over to F platoon, temporarily.

8  And that I was in F platoon until, I want to say, the

9  end of October before I was transferred back to the

10  patrol division.

11  Q.   Was F platoon -- isn't that also a patrol

12  platoon?

13  A.   It's supposed to be community policing.  I

14  still, to this day, am not sure exactly what the

15  difference between special ops and patrol division is,

16  you know, what their functions are, because they are

17  so intertwined.  I don't think a lot of officers are

18  really sure who is, you know, in charge of what.

19  Q.   Well, that's going to be my next question.  The

20  F platoon officer, don't they drive around and patrol

21  the streets just like any other platoon?

22  A.   No.

A-48

23  Q.   What do they do?

24  A.   They have a special schedule.  They attend

W&F

35

1   meetings.  They do -- there are some street activities

2   that they do, yes.

3       Q.    Isn't the whole point of community police to

4   have the officer out there on the streets to meet with

5   citizens and neighbors to have a police presence?

6       A.    Okay.

7       Q.    I'm asking you.  I mean, you're the police

8   officer.  I'm not.  So you tell me.

9       A.    Okay.  I'm a little confused.  Are you asking

10  me what the responsibility of a patrol officer is, or

11  a --

12      Q.    F platoon officer.

13      A.    F platoon officer.  Well, I worked there, and

14  our responsibilities -- we handled direct calls from

15  city council when they were receiving, you know,

16  concerns from the citizens.  We addressed those things

17  directly.  We did not answer complaints like patrol

18  officers do, like, meaning we didn't -- we didn't

19  answer radio calls like the officers do.  We had

20  special assignments and things of that nature.

21      Q.    Then, from F platoon, you went to E platoon in

22  I think you -- did you say November of 2001?

23      A.    Yes.                                        A-49

24      Q.    And what was different between F platoon and

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

William P. Babby, III - Mili

36

1    your duties in E platoon?

2    A.   Well, my duties in E platoon were patrol

3    functions, meaning, patrol the City of Wilmington and

4    answer radio calls.  And I also had a clearly

5    different schedule.

6    Q.   What was different about it?

7    A.   When I worked on F platoon, we worked two

8    shifts, a day work and an evening.  We had every other

9    weekend off, and we did not work holidays.  When I

10   went to E platoon, worked holidays, weekends, and

11   three revolving shifts.

12   Q.   You say holidays and weekends.  Did you work

13   all 12 city holidays that year?

14   A.   I don't remember specifically, but my

15   schedule -- you know, we always work holidays at some

16   point when you're working patrol schedule.

17   Q.   You worked each and every weekend in the

18   patrol, specifically your time in the E platoon?

19   A.   We work a rotating schedule, and I think we

20   have maybe one or two weekends off every three months,

21   meaning, the way the schedule rotates, our days off

22   may fall on a weekend like a Saturday or Sunday.

23   Q.   Back then were they doing the four on and three

24   off schedule?



A-50

WILCOX & FETZER LTD.
Registered Professional Reporters

37

1    A.    Yes.

2    Q.    So if you worked Monday through Thursday, you

3    would have Friday, Saturday, and Sunday off, is that

4    the way that worked?

5    A.    Yes.

6    Q.    How long did you stay in E platoon from

7    November?

8    A.    I've been in E platoon from the time I was

9    transferred until now.

10    Q.    Do you not like doing the E platoon?

11    A.    I would prefer, as a senior officer, to be able

12    to experience a different part of the police

13    department besides answering complaints for service.

14    Q.    Are there any more senior officers than you in

15    the E platoon?

16    A.    Yes.  There's three -- four.

17    Q.    Do you know their names off the top of your

18    head?

19    A.    I gave you two already.  Lloyd Staats and

20    Douglas Baylor, Anthony Johnson, and Francis Meriggi.

21    And there's one more, John Lucey.

22    Q.    Get off the E platoon for a bit now and moving

23    right along to number 5.  That's the extra job duty

24    request.  I'm assuming that's a typo in the date and

William P. Babby, III - Mili

38

1   that was January of '01.  You tell me.  You wrote it.

2   A.   The date says --

3   Q.   Oh, 25 January 2000.  I'm assuming that was a

4   typo and that was 2001, but you tell me.

5   A.   No.  This was -- no.  That's right.

6   Q.   It is 2000?

7   A.   Yeah.  This was -- we talked about this

8   earlier.

9   Q.   That's what I was going to ask you.  I thought

10  that was 2001.  You're saying this is January 2000.

11  A.   No.  This is correct because when I was filling

12  in for those positions in human resources, they

13  announce -- they posted for the jobs, and I put in for

14  them.

15  Q.   Now, you'll notice on the bottom corner there

16  it says, received 1/26/01.  Is that the typo?  One of

17  these dates is obviously incorrect.  It didn't linger

18  for a year I would imagine.  But you tell me?

19  A.   It's possible.  They've lost other documents.

20       Now that I look at this, yeah, this may be

21  a typo on my part.

22  Q.   I was thinking you probably -- go ahead?

23  A.   I think it was November 2000 was when I was on

24  light duty.  So this may be a typo on my part.

39

1    Q.    Again, I'm not trying to trip you up or

2    anything?

3    A.    No.  No.

4    Q.    I just want to make sure that I have my

5    chronology straight because -- putting pieces together

6    in this case.  So you think that that was supposed to

7    be January 25, 2001, in the date?

8    A.    Yes.

9    Q.    That was the job that you were filling in for

10   Jack Lucey, is that correct?

11   A.    Wait.  The --

12   Q.    The one we just looked for the extra duty --

13   A.    No.  This is the one that I did for --

14   Q.    Connor?

15   A.    -- Connor, Kevin Connor.

16   Q.    And you said the Office of Professional

17   Standards took over that position?

18   A.    At some point.  I don't know specifically when.

19   Q.    Was this extra job coordinator position vacant

20   at the time you submitted this request?

21   A.    If I put in for it, it was announced.  So I'm

22   assuming that it was vacant or it was going to be

23   vacated.

A-53

24   Q.    Next document right behind it, I guess we are

William P. Babby, III - Mili

40

1    on number 6.  That has the same date on it again.  I'm

2    assuming that's another typo in the year.

3            I know how it is in the month of January.

4    You're still on the last year's calendar.  I do that

5    too when I'm writing a check.

6    A.    I believe that it may be a typo, yes.

7    Q.    Again, not trying to trip you up.  Just making

8    sure.

9    A.    Yes.  1/26/01.  So, yes, it may be a typo.

10   Q.    That's supposed to be '01.

11           Again, same question, that's the Criminal

12   Investigation Division request.  Was there a vacancy

13   in the Criminal Investigation Division at that time?

14   A.    If I put in for it, it was probably posted that

15   there's a vacancy, yes.

16   Q.    Do you know how many other officers might have

17   applied for this vacancy?

18   A.    I have no idea.

19   Q.    Do you know who was actually selected to fill

20   that vacancy?

21   A.    No, I don't.

A-54

22   Q.    Continuing along to the document right behind

23   it, it's exhibit number 7, again, same thing, that

24   date is another typo.  Is that supposed to be 2001?

41

1    A.   Yes.

2    Q.   That's Detectives Division, specifically I

3  think you asked for -- you wanted to be in the --

4    A.   Evidence Detection.

5    Q.   Evidence Detection Unit.  Same question did you

6  hear about the vacancy in the Evidence Detection Unit

7  around that time?

8    A.   I believe that I did, yes.

9    Q.   Do you know how many other officers applied for

10  that vacancy?

11   A.   I don't know.

12   Q.   Do you know who was selected?

13   A.   I don't know that either.

14   Q.   You had previously applied for the Evidence

15  Detection Unit and Detectives Division before January

16  of '01, did you not?

17   A.   Yes.

18   Q.   Do you remember when?

19   A.   This is dated 21 August 2000.

20   Q.   Isn't that -- that's Criminal Investigation

21  Division, right?

22   A.   Yes.                                    A-55

23   Q.   I'm talking about the one I just asked you

24  about, prior to that one.



William P. Babby, III - Mili

42

1    A.    Oh, the Evidence Detection?

2    Q.    The Evidence Detection Unit is in Detectives,

3    right?

4    A.    It's -- well, it all falls under the same

5    division, but they're a separate unit.  So when you

6    apply for that position, you're not applying for

7    Detectives; you're applying to be an evidence

8    detection officer.

9    Q.    Oh, okay.  That was which one?  That was the

10   one we just went over was January 25, 2001?

11   A.    Yes.

12   Q.    Let me keep going backwards.  August of 2000,

13   that was the Criminal Investigation Division request.

14   A.    Yes.

15   Q.    This would be before this incident happened

16   with Billy Wells in the spring of '01, I guess it was?

17   A.    Yes.

18   Q.    Was there a vacancy in the Criminal

19   Investigation Division at that time?

20   A.    I'm going to have to assume that there was if I

21   put in for it.  Again, I received postings and put in

22   for positions when they are available.

23   Q.    Do you know how many other officer may have

24   applied for this vacancy?



William P. Babby, III - Mili

43

1    A.    No.

2    Q.    Do you know who was selected?

3    A.    No, I do not.

4    Q.    Keep going back towards June of '99.  Okay.

5    That was the other Evidence Detection Unit officer

6    position.  So you weren't applying to be detective;

7    you were applying to be an Evidence Detection Unit

8    officer, is that correct?

9    A.    For this one here?

10    Q.    Yes.

11    A.    Yes.

12    Q.    What do they do, go around with the camera,

13    take the pictures and stuff like that?

14    A.    They process crime scenes.

15    Q.    What does that entail?

16    A.    It entails photographing, cataloging evidence

17    from a crime scene.

18    Q.    And how did you hear about a vacancy in this

19    division at that time?

20    A.    I'm going to assume that it was posted and I

21    put in for it.

22    Q.    The last one that I found was the February of

23    '99 request, and that was also Detectives Division

24    transfer.  This was actually a position for domestic

44

1   violence investigator, which, I guess, is a little bit

2   different than cataloging at a crime scene that you

3   just told me about.  I mean, you tell me because

4   you're the one that applied for it obviously?

5      A.    Oh, okay.  Yeah.  Domestic violence

6   investigator.  Mm-hmm.

7      Q.    Again, that was before this whole incident with

8   William Wells in 2001?

9      A.    Yes.

10     Q.    Bottom line is you didn't get that particular

11  transfer either?

12     A.    No.

13     Q.    Those are the transfers I pulled from your

14  personnel file.  You say you have more in here.  Take

15  a look at them.

16             MR. MARTIN:  Can we go off the record a

17  moment?

18             (Discussion off the record.)

19             (Recess taken.)

20  BY MR. MILI:                                     A-58

21     Q.    We don't have too much to go.  We'll get the

22  damages questions out of the way first and then go

23  back to these transfers just to speed things along.

24             I would ask you to go back to the

45

1    complaint that was filed and fast forward to

2    paragraph 55.

3              Paragraph 55 talks about how you suffered

4    a loss of employment opportunities.  Can you tell me

5    what opportunities you lost out on?

6    A.    I've lost out on the opportunity to be

7    transferred to the detective division, to the Evidence

8    Detection Unit, to Traffic Division.  By loss of

9    opportunity I mean, as a patrol officer, obviously I

10   work in the street and I answer calls for service.  I

11   gain no other experience whatsoever to carry with me

12   when I leave from the police department.  By going to

13   one of these other divisions, I receive more training

14   in investigations and evidence and crime scene and

15   traffic investigation, things that I can take with me

16   when I leave to further my employment opportunities.

17   By being kept in patrol, I'm losing that opportunity.

18   Q.    Do you plan on leaving any time soon?

19   A.    I would like to, yes.

20   Q.    How soon?

21   A.    Well, my 20 years will be here in a year and a

22   half.

23   Q.    That same paragraph talks about how you lost

24   considerable pay.

William P. Babby, III - Mili

46

1    A.    Right here I say --

2    Q.    How did you calculate this loss of considerable

3    pay that's referenced here?

4    A.    Meaning, if I was working a different schedule,

5    other than patrol, meaning specifically a day work

6    position like I had in Special Operations Division, I

7    have the opportunity to work extra -- possibly up to

8    25 -- 25 hours per week, meaning after my regular work

9    schedule.  There's more of an opportunity for me to

10   make more money working extra because you have the

11   weekends off, holidays off.  You have the nights off.

12   And working a patrol schedule, it's -- it is more

13   difficult.  We don't have the opportunity that

14   somebody would that works a day work position.

15   Q.    You mean like the St. Anthony's Festival,

16   working the --

17   A.    I mean -- I mean, we have lot more jobs than

18   just the St. Anthony's Festival.  We have construction

19   jobs.  We have -- there's too many to sit here and

20   list.  But I would have more opportunity working a day

21   work schedule to make more money than I would working

22   a patrol schedule.

                                            A-60

23   Q.    Let's go back to -- I want to see what

24   transfers, if any, I may have overlapped.  I see that,

William P. Babby, III - Mili

47

1  in interrogatory number 1, you listed seven transfers.

2  I was a little confused by the pleading for nine

3  transfers since I kept going in your file until I

4  found nine, but it looks like you have seven.  But not

5  all of them are what I asked you about.  So let's go

6  through.

7          Number 1, you talk about the February

8  21st, 2002, transfer.  I already asked you about that.

9          Number 2 is the May 10, 2004, transfer.  I

10 asked you about that.  Okay.  While we are on that

11 subject, you note that Corporal Gary Taber got that

12 job?

13   A.   Yes.  And the only reason I know that is

14 because it was information that was given to me.

15   Q.   Yeah.  That's what -- he was the last person to

16 be picked for CID.

17          Do you think your you're more qualified

18 than Gary Taber for that job?

19   A.   Yes.

20   Q.   Why?                                    A-61

21   A.   I have more time on the job.  I'm a senior

22 officer.  I had more experience.

23   Q.   Is there anything else besides your years on

24 the force --

William P. Babby, III - Mili

48

1    A.    Well, I have a lot of training.  I'm college

2    educated, and I also have crime scene investigation

3    training.  I have received numerous additional

4    training, as you will, from my career as a police

5    officer.  Aside from that, I don't know what else

6    you're looking for.

7    Q.    That gets me back to what I asked you a moment

8    ago about lost employment opportunities.  You said

9    that you have lost the opportunity to get more

10   training.

11   A.    What I meant was, when you're transferred into

12   Criminal Investigation Division, Evidence Detection,

13   Traffic Unit, any of these other places, you are given

14   training while you're there.  Like you just don't pull

15   an officer off the street and throw him in Detectives

16   without giving him the proper training to properly

17   investigate a crime because their investigating a

18   crime is totally different than ours from patrol.

19   Q.    Number 3 is one I didn't ask you about,

20   Evidence Decision Unit.  I guess that's -- I did ask

21   you about other Evidence Detection Unit transfers, but

22   I don't recall seeing a July 4, 2005, request.  Tell

23   me about that one.

24   A.    This was a request that I submitted through the

William P. Babby, III - Mili

49

1    chain of command to be transferred to Forensic

2    Services Unit which it's now referred to as.

3        Q.    Do you know that your not being transferred had

4    anything to do with your complaint about Sergeant

5    Wells?

6        A.    Yes.

7        Q.    Why do you think that?

8        A.    I just find it suspect that every -- every

9    request that I put in has been denied.

10       Q.    Was there, in fact, a vacancy for the EDU in

11   July of '04 or -- excuse me -- '05?

12       A.    I believe that there was, yes.

13       Q.    Do you know who filled it?

14       A.    No, I don't.

15       Q.    Same thing for, I guess, number 4 in your

16   interrogatory response, school resources officer,

17   August 21 of 2005.  Was there a vacancy in that

18   position?

19       A.    Yes.

20       Q.    Do we still have that position?

21       A.    Yes.

22       Q.    Do you know who's working in that position?

23       A.    I think Ken Boyd.  I think there's actually

24   three officers in that position now, if you just give

50

1    me a second.

2      Q.    Okay.

3      A.    Ken Boyd.   Harvest Smallwood.   And I think

4    Diana Brown.

5      Q.    Do you think you're more qualified than Ken

6    Boyd for that position?

7      A.    I don't know.

8      Q.    Do you think you're more qualified than Harvest

9    Smallwood for that position?

10     A.    I don't know.

11     Q.    Last person you said was --

12     A.    Diana Brown.

13     Q.    -- Diana Brown, do you think you're more

14   qualified than her for that position?

15     A.    I don't know.   I don't know what their

16   qualifications are.

17     Q.    Number 5 is another EDU request.   I didn't ask

18   you about that.   Do you have that in front of you?

19     A.    Mm-hmm.

20              MR. MARTIN:   Yes?
                                              A-64
21              THE WITNESS:   Yes.   I'm sorry.

22              MR. MILI:   I know that's annoying.   The

23   court reporter --

24              THE WITNESS:   That's the first one I did.

51

1              MR. MILI:  You're doing pretty well so

2    far, yes.  Commend you for that.

3    BY MR. MILI:

4    Q.    Job task analysis in the human resources

5    division, is that this posting that you were talking

6    about of a vacancy?

7    A.    Well, when they send something down to us to

8    let us know that the position is available, they

9    recommend that you check the job task analysis form

10   upstairs in human resources.  And basically all it is

11   is a piece of paper that says what you're expected to

12   do if you're transferred into that position.

13   Q.    Do you know who filled that position?

14   A.    No, I don't.

15   Q.    Next would be number 6 that you mentioned is

16   the section specialist in Special Ops for December

17   '05.  I think I asked you about that already, covered

18   it.

19              The last one, I guess, is the most recent

20   one.  See this one.  This is the Traffic Division,

21   March 10 of 2007.  You say Corporal Pfeifer got that

22   job.

23   A.    Yes.                                    A-65

24   Q.    Do you think you're more qualified than him to

52

1    get that job?

2    A.    I don't know what his qualifications are.

3    Q.    Shortly before this request, this transfer

4    request, were you disciplined by the Office of

5    Professional Standards for, I guess, improperly

6    conducting an accident?

7    A.    It was failure to properly investigate.

8            MR. MARTIN:   Please let him finish the

9    question.

10            THE WITNESS:   Oh, I'm sorry.

11    Q.    I think you anticipated it.   Go ahead.

12    A.    I'm sorry to interrupt.

13    Q.    No.   That's all right.   You anticipated.   You

14    know where I'm going.

15    A.    Failure to properly investigate an accident.

16    Q.    What were you accused of failing to do?

17    A.    Properly investigate the accident.

18    Q.    What should you have done in investigating this

19    accident that you did not do?

20    A.    I don't remember specifically what I didn't do.

21    Q.    Were you penalized?

22    A.    Yes.

23    Q.    What was the penalty?

24    A.    Two days suspension.                A-66

William P. Babby, III - Mili

53

1    Q.    Did you appeal it?

2    A.    No.

3    Q.    Did you have a full hearing with the Internal

4    Affairs Division?

5    A.    Yes.

6    Q.    Do you remember when that was?

7    A.    It would have been last October.

8    Q.    Do you think that had any bearing on whether

9    you got this job in Traffic Division?

10   A.    No.

11   Q.    What would this job entail in Traffic Division,

12   this job that you applied for?

13   A.    This job here had nothing to do with

14   investigating accidents.  I found out later.  It is a

15   traffic analysis job, which is actually a

16   computer-related position where you have to do

17   analysis of all the accidents in the city.  The

18   officer doesn't even do any traffic enforcement or

19   investigation.

20   Q.    You just said analysis of traffic accidents in

21   the city, is that what you said?

22   A.    Yes.

23   Q.    What specifically would this position require

24   you to analyze in these accidents?

William P. Babby, III - Mili

54

1    A.    I don't know for sure, but I'm assuming that

2    the different locations of accidents in the city.

3    They are looking for statistics.  But I do know that

4    this is not an investigation position.

5    Q.    Is it something different than what you had

6    expected when you applied for it?

7    A.    Yes, because initially, when they put it out,

8    they just said they wanted a traffic investigator.

9    They didn't say -- they didn't give the specifics of

10   what the position was.

11   Q.    Let me skim these interrogatories one last

12   time, make sure I don't miss anything.  I think we are

13   done.

14             Briefly, the topic about Lieutenant Rock

15   telling you to stay on 12th Street or the 1200 block

16   of 6th Street without enforcing any traffic laws, who

17   was present at this meeting?

18   A.    You mean when he gave me the assignment?

19   Q.    Yes.

20   A.    No.  He just --

21   Q.    Just the two of you?                    A-68

22   A.    He just came up to me and said, "This is the

23   assignment you have," and told me what to do.

24   Q.    Told you not to enforce the traffic laws?

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

William P. Babby, III - Mili

55

1    A.    Told me to take a police car out and sit in the

2    1200 block of West 6th Street and not to enforce any

3    laws, that I was there to hopefully thwart the drug

4    activity that's going on in that block.

5    Q.    At some point afterwards did you have a meeting

6    with Lieutenant Rock, And Sergeant Corey Staats about

7    your performance in that job?

8    A.    Yes.

9    Q.    What was discussed in that meeting?

10   A.    They had concerns as to why I hadn't produced

11   any arrests or traffic tickets.

12   Q.    You say they, which of the two, or both?

13   A.    What do you mean?  They meaning they were both

14   in the meeting, but I was addressing Lieutenant Rock.

15   I was telling him that, well, you told me to go there

16   and sit, and I did what you told me to do.

17   Q.    And what was the Lieutenant Rock's response?

18   A.    He called me a liar and said I was lazy and --

19   I don't remember specifically, but I do remember him

20   calling me those two things.

21   Q.    One last question.  Having trouble tracking

22   down Sergeant Morrissey lately.  You made this

23   allegation in the complaint about how Sergeant          A-69

24   Morrissey had told you that Lieutenant Rock said that



56

1    you were -- told Sergeant Morrissey that you were a

2    no-good piece of shit.

3        A.    Mm-hmm.

4        Q.    How did that conversation come up?

5        A.    Sergeant Morrissey approached me when he found

6    out that I had made a complaint with the Department of

7    Labor and said to me, "I think this is something that

8    you should know."  He brought it to my attention.  I

9    had no idea.

10             MR. MILI:  I think we are done.  Thank you

11   for your cooperation.  Sorry I took a little bit

12   longer than I expected.  I was shooting for an hour,

13   but done for now.

14             MR. MARTIN:  I have no questions.

15             Pat, you have the opportunity to read the

16   transcript and/or to waive the reading and rely upon

17   the accuracy of the reporter.

18             THE WITNESS:  I'm going to waive the

19   reading.

20             (Deposition ended at approximately

21   11:20 a.m.)

22

23

24                                              A-70

**W&F**

```
 1                    INDEX TO TESTIMONY

 2

 3   WILLIAM P. BABBY, III                    PAGE

 4        Examination by Mr. Mili                 2

 5
                         -----
 6
                    INDEX TO EXHIBITS
 7

 8   BABBY DEPOSITION EXHIBIT NO.

 9   1      Complaint

10   2      Transfer Request, 10 May 04

11   3      Transfer Request, 21 February 02

12   4      Transfer Request, 27 March 01

13   5      Transfer Request (Extra Job Coordinator)
            25 January 00
14
     6      Transfer Request (Criminal Investigative
15          Division) 25 January 00

16   7      Transfer Request (Evidence Detection Unit)
            25 January 00
17
     8      Transfer Request, 21 August 00
18
     9      Transfer Request, 22 June 99
19
     10     Transfer Request, 7 February 99
20

21

22

23

24                                              A-71
```

58

State of Delaware )
                 )
New Castle County )

## CERTIFICATE OF REPORTER

        I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 30th day of May, 2007, the
deponent herein, WILLIAM P. BABBY, III, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
typewriting under my direction.

        I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

        I further certify that reading and signing of
the deposition were waived by the deponent and
counsel.

        I further certify that I am not counsel,

attorney, or relative of either party, or otherwise

interested in the event of this suit.




A-72

Ann M. Calligan, RMR

(Certification No. 186-RPR)

(Expires January 31, 2008)



WILCOX & FETZER LTD.
Registered Professional Reporters



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM P. BABBY, III, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No.  06-552 JJF |
| v. | : | |
| | : | |
| CITY OF WILMINGTON | : | |
| DEPARTMENT OF POLICE, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S ANSWERS TO
## DEFENDANT'S FIRST INTERROGATORIES DIRECTED TO PLAINTIFF

Pursuant to Federal Rule of Civil Procedure 33, Defendant propounds the following Interrogatories to be answered by Plaintiff.  Plaintiff is to answer in writing, under oath, the following interrogatories, within thirty (30) days of the date of service by Defendant.  These Interrogatories are deemed continuing.

## INSTRUCTIONS AND DEFINITIONS

These instructions and definitions form an integral part of these interrogatories which follow:

A.    1.    When used in reference to a natural person, "identify," "identity," or "identification" means to provide the following information about said natural person:

   a.    The person's full name;

   b.    The person's present or last known business and residence address;

   c.    The person's present or last known business or professional affiliation; and

   d.    The person's present or last known business or professional position, including his or her job title and description of his or her job functions, duties, and responsibilities.

   2.    "Complaint" refers to the pleading filed by Plaintiff on October 5, 2005  to

initiate this civil action.

      3.    When used in reference to any entity other than a natural person, state:

           a.    Its full name;

           b.    The address of its principal place of business;

           c.    The jurisdiction under the laws of which it has been organized or incorporated and the date of such organization or incorporation;

           d.    The identity of all individuals who acted and/or who authorized another to act on its behalf in connection with the matter referred to;

           e.    In the case of a corporation, the names of its directors and principal officers;

           f.    In the case of any entity other than a corporation, the identities of its partners or principals; and

           g.    If the entity has been dissolved or ceased to exist, the date on which such dissolution occurred.

      4.    When used in reference to a document, state:

           a.    The nature of the document; e.g., letter, contract, memorandum, and any other information; e.g., its title, index, or file number, which would facilitate the identification thereof;

           b.    Its date of preparation;

           c.    Its present location and the identity (as defined above) of its present custodian or, if its present location and custodian are not known, a description of its last known disposition;

           d.    Its subject matter and substance or, in lieu thereof, annex a legible copy of the document to the answers to these interrogatories;

           e.    The identity (as defined above) of each person who performed any function or had any role in connection therewith; e.g., author, contributor of information, recipient, etc. or who has any knowledge thereof, together with a description of each such person's function, role, or knowledge;

           f.    The identity (as defined above) of your source of all documents, and if the source is any governmental body, the identity (as defined above) of the individual who provided

you with the document; and

g.    Whenever the identification of a document is requested and the document is one of a series of two or more pages, or in the case of magnetic tape, microfilm, print-outs, etc., is contained in a portion thereof, include in your identification of said document the number of particular page or pages (or other descriptive aid) and of the particular line or lines thereof upon which the information referred to in the interrogatory or in your answer appears.

B.    In answering each interrogatory:  (i) identify each document relied upon or which forms the basis for the answer or the substance of which is given in answer to the interrogatory; (ii) state whether the information furnished is within the personal knowledge of the affiant and, if not, the name and address of each person to whom the information is a matter of personal knowledge, if known; and (iii) in lieu of identifying each document, or stating the "terms" or "substance" of a document, a true and correct copy thereof may be annexed thereto and incorporated in the answers to these interrogatories.

C.    "You" and "Your", shall mean Plaintiff in this action, its or his or her agents, officers, directors, and employees, and all other persons acting or purporting to act on its/his or her behalf and all of its (his or her) representatives, including its attorneys.

D.    "Person" shall mean an individual, firm, partnership, association, corporation or other legal, business or governmental entity.

E.    "Document" is used as the term is used in Fed. R. Civ. P. 34, and includes without limitation, the following items, whether printed or recorded or reproduced by hand, namely: studies; papers; analyses; evaluations; reports; reviews; agreements; communications, including intra company communications; correspondence; telegrams; cables; memoranda; records; books; summaries of records of personal conversations or interviews; diaries; forecasts; statistical statements; accounts; work papers; graphs; charts; maps; diagrams; blueprints; tables; indices; pictures; recordings; tapes; microfilm; charges; accounts; analytical records; minutes or records of meetings or conferences; reports or summaries of interviews; reports of summaries of investigations; opinions or reports of consultants; appraisals, reports or summaries of negotiations; brochures; pamphlets; circulars; trade letters; press releases; contracts; video tapes; stenographic, handwritten or any other notes; projections; working papers; checks, front and back; check stubs or receipts; invoice vouchers; tape data sheets or data processing cards or discs of any other written, recorded, transcribed, punched, taped, filed or graphic matter, however produced or reproduced; e-mail; and any other document or writing of whatever description, including but not limited to any information contained in any computation, although not yet printed out, within the possession, custody or control of, or which may be obtained by, the answering party.  A draft shall be considered a separate document.

F.    "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The use of the word "including" shall be construed to mean "without limitation."

G.    "Business" means any commercial venture or company, including without limitation, insurance brokerage or agency.

H.    "Communication" means not only oral communications but also "document" (as defined above), whether or not the document or the information it contains was transmitted by its author to any other person.

I.    If you decline to answer any interrogatory on the basis of attorney-client privilege or the work product doctrine, identify the factual basis for the claim in sufficient detail so as to permit the Court to adjudicate the validity of the claim. With respect to those records or documents which are withheld in whole or in part, and for which privilege, attorneys' work product or trial preparation protection is claimed, counsel is requested to provide a list of documents withheld, including a description which includes the identity of the author(s), the date, the recipient(s) and the subject matter and the basis for the privilege asserted and state whether you will submit such documents to the Court for an in camera determination as to the validity of the claim of privilege.

## INTERROGATORIES

1.    As to Paragraph 48 of the Complaint, please identify each of the nine transfer

requests, specifying:

(a) who was assigned to the position to which you requested a transfer;

(b) why you believe that you are more qualified than the person identified in sub-section (a) for each transfer;

(c) any difference in pay that would have resulted from each transfer;

(d) any difference in scheduling that would have resulted from each transfer; and

(e) any difference in job responsibilities that would have resulted from each transfer.

**ANSWER**:    Plaintiff can recall seven (7) requests for transfers in chronological order as follows:

(1)    C.I.D., 21 February 2002
    (a)    Unknown
    (b)    Based upon Plaintiff's 18 years of experience, additional police training, college courses and superior performance reviews, Plaintiff is qualified to perform the requested positions.
    (c)    No difference in pay
    (d)    Difference in scheduling; Not the Patrol shift Plaintiff is currently assigned to.
    (e)    CID is responsible for the investigation of homicides, burglaries and

financial and sex crimes

(2) C.I.D., 10 May 2004
   (a) Corporal Gary Tabor
   (b) Based upon Plaintiff's 18 years of experience, additional police training, college courses and superior performance reviews, Plaintiff is qualified to perform the requested positions.
   (c) No difference in pay
   (d) Difference in scheduling; Not the Patrol shift Plaintiff is currently assigned to.
   (e) CID is responsible for the investigation of homicides, burglaries and financial and sex crimes

(3) E.D.U., 4 July 2005
   (a) Unknown
   (b) Based upon Plaintiff's 18 years of experience, additional police training, college courses and superior performance reviews, Plaintiff is qualified to perform the requested positions.
   (c) n/a
   (d) n/a
   (e) E.D.U. is responsible for the investigation of crime scenes

(4) School Resource Officer, 21 August 2005
   (a) Unknown
   (b) Based upon Plaintiff's 18 years of experience, additional police training, college courses and superior performance reviews, Plaintiff is qualified to perform the requested positions.
   (c) n/a
   (d) n/a
   (e) n/a

(5) E.D.U., 19 September 2005
   (a) Unknown
   (b) Based upon Plaintiff's 18 years of experience, additional police training, college courses and superior performance reviews, Plaintiff is qualified to perform the requested positions.
   (c) n/a
   (d) n/a
   (e) E.D.U. is responsible for the investigation of crime scenes

(6) Sector Specialist (Special Operations Division), 1 December 2005
   (a) Unknown
   (b) Based upon Plaintiff's 18 years of experience, additional police training, college courses and superior performance reviews, Plaintiff is qualified to perform the requested positions.

A-77

    (c)    n/a
    (d)    n/a
    (e)    n/a

(7)    Traffic Division, 10 March 2007
    (a)    Corporal Pfeiffer
    (b)    Based upon Plaintiff's 18 years of experience, additional police training, college courses and superior performance reviews, Plaintiff is qualified to perform the requested positions.
    (c)    Unknown
    (d)    Unknown
    (e)    Unknown

2.    As to Paragraph 55 of the Complaint, please identify the "loss of employment Opportunities" to which you are referring, including but not limited to:

(a) any loss in pay;

(b) any loss in employment benefits; and

(c) any change in job responsibilities.

**ANSWER:**    Plaintiff's failure to be transferred resulted in lack of career growth and inability to obtain other police experience (such as in detectives or E.D.U.), skills that would benefit Plaintiff in other careers after retiring from the police department. Plaintiff has also lost the ability to earn more income. Working in a specialized unit enables Plaintiff to work more overtime and extra jobs as the schedules are not as restrictive as a patrol schedule.

3.    What is the computation for your alleged claim of damages?

**ANSWER:**    Plaintiff estimates that had he been working day work or a less restrictive schedule than the patrol schedule with weekends off, he would be able to work an additional 25 hours per week on average.

4.    With regard to sub-section (a) of the Wherefore Clause of the Complaint, please specify how you have calculated the "back pay" that you believe you are entitled to?

**ANSWER:**    At an average of 25 hours per week additional work, Plaintiff could have earned approximately $ 3,500.00 per month at the rate of $ 35.00 per hour through December 2004 and $ 4,000.00 per month to the present at a rate of $ 40.00 per hour.

5.     Please list and describe each career advancement opportunity to which you are referring in Paragraph 57, including:

(a)     what were your qualifications for each career advancement opportunity;

(b)     if another employee was given the "career advancement opportunity" to which you are referring, what were that employee's qualifications;

(c)     any difference in pay, rank, scheduling, and job responsibilities for each "career advancement opportunity" to which you are referring.

**ANSWER:**     See Subsection B of answer provided to Interrogatory No. 1;  Plaintiff considers the "career advancement opportunity" as a transfer to a specialized division.

6.     Please list and describe each and every instance of the "cold shoulder treatment" to  which you are referring in Paragraph 45 of your Complaint, specifically noting:

(a) the name of the person(s) who gave you the cold shoulder treatment;

(b) the date and place of each incident of the cold shoulder treatment;

(c) names of any person(s) present for each incident of the cold shoulder treatment.

**ANSWER:**     There are too many instances wherein Plaintiff was given a "cold shoulder" to list them specifically.  However, below are brief examples of such treatment:

- On several occasions while working, Plaintiff walked into either the House Sergeants' or Sergeants' office and Lieutenant Mitchell Rock was present.  Rock would immediately stop talking when Plaintiff walked in and would not acknowledge Plaintiff's presence in the room.  Rock would not look in Plaintiff's direction or even speak to Plaintiff.  In fact, Rock would try to avoid Plaintiff altogether.  This scenario happened on several occasions for several years up to the time Rock recently left the police department.

- Lieutenant Wells has not spoken to Plaintiff since Plaintiff made the first complaint against him.  Plaintiff has been on the same elevator at work with Wells and Wells would not even look or speak to Plaintiff.  Plaintiff has passed Wells several times in the rear police parking lot and Wells would not speak to Plaintiff. Plaintiff has even worked out at the same gym while Wells was working out and Wells continued to avoid Plaintiff.  There was one instance when Plaintiff and Lieutenant Akil were standing in the detectives' hallway conversing.  Wells came

out of the detectives' area and started walking towards them.  Wells looked up and saw Plaintiff and Wells stopped abruptly, looked at Plaintiff and turned around without speaking to Plaintiff or Lieutenant Akil and went in the other direction.    Lieutenant Akil asked Plaintiff what was happening and Plaintiff explained to him that Wells had not spoken to Plaintiff in several years since the time of the initial complaint.

7.    What "fellow officer" are you referring to in Paragraph 40 of your Complaint.

**ANSWER**:    Corporal Alfred Izqueirdo

8.    What is the White Book's protocol on a police officer's obligation to salute a

higher ranking officer?

**ANSWER**:    The departmental policy is set forth as Directive 7.12 entitled "Military Courtesy" dated 22 November, 1993 and is included in Plaintiff's Responses to Request for Production.

9.    On your job application to the Wilmington Police Department, what race or

national origin did you list for yourself?

**ANSWER**:    White

10.    What are Officer Counts' qualifications to work in the Crime Free Housing

Division?

**ANSWER**:    Plaintiff is not aware of Officer Count's qualifications at this time.

**MARTIN & WILSON, P.A.**

_____
**JEFFREY K. MARTIN** (DE Bar I.D. #2407)
1509 Gilpin Avenue
Wilmington, DE 19801
(302)  777-4681
E-mail – jmartin@martinandwilson.com
Attorney for Plaintiff

Date April 30, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIAM P. BABBY, III,                  :
                                        :
    Plaintiff,                          :
                                        :        C.A. No.  06-552 JJF
v.                                      :
                                        :        TRIAL BY JURY DEMANDED
CITY OF WILMINGTON                      :
DEPARTMENT OF POLICE,                   :
                                        :
    Defendant.                          :

### AFFIDAVIT OF BOBBY CUMMINGS

STATE OF DELAWARE          )
                           :     SS.
NEW CASTLE COUNTY          )

    I, BOBBY CUMMINGS, being duly sworn according to law, depose and state that the information contained herein is based on my own personal knowledge and is true and correct:

    1.    I have been employed as a law enforcement officer with the Wilmington Police Department since 1985.

    2.    I currently hold the rank of Captain in the Wilmington Police Department.

    3.    In May of 2001, the Wilmington Police Department intended to implement a crime-free housing unit, pending sufficient funds allotted by City Council.

    4.    City Council did not allot funds for the crime-free housing unit, and so the crime-free housing unit never became operational.

    5.    Although the crime-free housing unit did not become operational, I was authorized to assign one officer to work as the crime-free housing officer.

A-81

6.      I selected Tashawn Counts to work as the crime free housing officer because Counts showed concern for working with the public, was an upcoming officer, and I wanted to give him an opportunity to showcase his skill, and I thought he would be good for the position.

_____
/Bobby Cummings

SWORN AND SUBSCRIBED before me this 27th day of September, 2007.

_____
Notary Public

ANNE S. HERRELL
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Oct. 15, 2009

A-82

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM P. BABBY, III, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 06-552 JJF |
| v. | : | |
| | : | TRIAL BY JURY DEMANDED |
| CITY OF WILMINGTON | : | |
| DEPARTMENT OF POLICE, | : | |
| | : | |
| Defendant. | : | |

### AFFIDAVIT OF WILLIAM F. WELLS

STATE OF DELAWARE  )
                :    SS.
NEW CASTLE COUNTY  )

I, WILLIAM F. WELLS, being duly sworn according to law, depose and state that the information contained herein is based on my own personal knowledge and is true and correct:

1. I have been employed as a law enforcement officer with the Wilmington Police Department since 1986.

2. I currently hold the rank of Lieutenant in the Wilmington Police Department.

3. I worked in the Special Operations Division from April 3, 2001 to March of 2003, at which time I became the Public Information Officer, and served in that capacity until July of 2006, and then I was assigned to the Patrol Division.

4. After William P. Babby, III, filed the above-captioned lawsuit in this matter, I reviewed the list of job transfer requests made by Babby from 2001 to the present, which are as follows:

(1) the Crime-Free Housing Division in May of 2001,

A-83

(2) the Criminal Investigation Division on February 21, 2002,

(3) the Criminal Investigation Division on May 10, 2004,

(4) the Evidence Detection Unit on July 4, 2005,

(5) the School Resources Officer Position on August 21, 2005,

(6) the Evidence Detection Unit on September 19, 2005,

(7) the Section Specialist Position in the Special Operations Division on December 1, 2005, and

(8) the Traffic Division on March 10, 2007.

5.      I hereby attest that I did not have any hiring authority for any of the eight transfers listed in Paragraph 4 of this affidavit, and I did not make any hiring recommendations for any of those eight transfers.

William F. Wells

SWORN AND SUBSCRIBED before me this 27 day of September, 2007.

Notary Public
LISA A. HEMPHILL
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Sept. 3, 2010

A-84

**DEPARTMENT OF POLICE**
Wilmington, Delaware



DEPARTMENTAL INFORMATION          ASSIGNMENT: _Patrol_

TO: _Chief Michael Szczerba_

FROM: _Cpl. William P. Babby III_

DATE: _21 Feb 02_

RE: _Request For Transfer._

Sir,

The purpose of this departmental information is to inform you, that I would like to be transferred to the Criminal Investigative Divison (Detective). I have reviewed the job task analysis description in Human Resources and feel that I am ready for position of criminal Investigator.

I have been with the department for 13+ years, where I have spent all of my time in the uniform divison as a patrol officer and sector specialist. All of this positions require you to be alert, organized and have the ability to communicate effectively with the criminal

Page _1_ of _2_

A-85

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

DEPARTMENTAL INFORMATION CONTINUATION                PAGE ___2___ OF ___2___

ELEMENT AS well As the public. My YEARS AS A PATROL OFFICER have helped me to learn to properly INVESTIGATE AND SECURE A CRIME SCENE.

I Also Spent two YEARS in College Studying the CRIMINAL JUSTICE FIELD. I took SEVERAL COURSES that directly relate to the position of detective, they ARE AS Follows: CRIMINAL Procedure, EssenTIALs in Interviewing, CRiminal Evidence, CRIMINAL INVESTIGAT, AND Collecting & ANAlyzing CRIME ScENE EVidENCE. I have ALso hAd SEVERAL police training SemiNARs, including Homicide INVESTIGATION in 2001.

I Feel ConFidENT that my YEARS OF STREET experience AND College Schooling will enhance My Ability to be A thorough investigAToR.

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

<u>DEPARTMENTAL INFORMATION</u>

TO:        Michael J. Szczerba
           Chief of Police

FROM:      S/Cpl. William P. Babby III
           Uniform Services Division

DATE:      10 May 04

RE:        Transfer Request


   Sir;

   The purpose of this departmental information is to inform you that I would like to be
transferred to the Special Operations Division. I have reviewed the job task analysis
description in Human Resources and feel that I am qualified to handle a position in this
division.
   I have been with the department for well over fifteen years and I believe my years of
training and experience qualify for any position in the division.

A-87

**OFFICE OF PUBLIC SAFETY**
**DEPARTMENT OF POLICE**
**WILMINGTON, DELAWARE**

## MEMORANDUM

TO:       Capt. James Jubb
            Commanding Officer
            Criminal Investigations Division

FROM:    Capt. Michael E. Maggitti
            Commanding Officer
            Human Resources Division

DATE:    June 1, 2004

RE:        **REQUEST FOR TRANSFER**

The following officer has submitted a Departmental Information report requesting consideration for a position in the Criminal Investigations Division. Attached is the individual's report.

S/Cpl. William P. Babby III

Your attention to this matter is appreciated.

MEM/mra

cc:     Posting file
       Personnel file

# OFFICE OF PUBLIC SAFETY

## DEPARTMENT OF POLICE

### WILMINGTON, DELAWARE

## DEPARTMENTAL INFORMATION

TO:      **Michael J. Sczcerba**
               **Chief of Police**

FROM:    **William P. Babby III**
               **Senior Corporal**

DATE:    **15 May 2005**

RE:      **Request for Transfer**

Sir,

    I am writing this departmental information in response to the job posting for the position "Evidence Storage Officer." I have been with the department now for over sixteen years and I feel that I am qualified for this position.

    I have ten years of business experience, as you may remember I use to own and operate Law & Order Police Supplies. While running this business, a major part was managing the flow of inventory in and out of the store. It involved cataloging, tracking and maintaining the store inventory as well as assigning stock numbers to each product. I also used several computer programs to store and track the inventory, pricing and accounting functions as well.

    This position involves knowledge of tracking and maintaining evidence and is a major function of the police department. I have the skills and knowledge it takes from my years of business experience to handle this position with expertise.

Respectfully Submitted

William P. Babby III

Sgt. Michael F. Rodriguez  E/65YS

Insp.  5/20/05

A-89

# OFFICE OF PUBLIC SAFETY
# DEPARTMENT OF POLICE
# WILMINGTON, DELAWARE

**DEPARTMENTAL INFORMATION**　　　　　　　**ASSIGNMENT: Patrol**

**TO:**　　　**Michael Szczerba**
　　　　　　**Chief of Police**

**FROM:**　　**William P Babby III**
　　　　　　**Senior Corporal**

**DATE:**　　**04 July 2005**

**Re:**　　　**Request for Transfer**

**Sir,**

　　I am writing to request a transfer to the Forensic Services Unit. I have been with the police department for over sixteen years. I have attended several seminars that are directly related to Forensic work; one being a Homicide investigation school.

　　I have also attended and successfully completed several college courses that are related to this position. All certificates and college credits are on file in my personnel folder kept in the Human Resources Division. I feel that with my years of street experience, seminar and college training, I am very qualified to handle the position of Forensics Officer and I wish to be considered for a transfer to this position.

**Respectfully Submitted**

A-90

# DEPARTMENT OF POLICE
# WILMINGTON, DELAWARE

## DEPARTMENTAL INFORMATION

**TO:**      **Michael J. Sczcerba**
            **Chief of Police**

**FROM:**    **S/Cpl. William Babby III**

**DATE:**     **08/21/05**

**RE:**       **Request for Transfer**

Sir,

  I am writing to request a transfer to the position of "School Resource Officer". I have reviewed the job task analysis form in Human Resources and I feel that I am qualified for this position. I have well over 16 years with the department now and my time and experience in patrol has prepared me to handle this position.

  I am a great problem solver, creative thinker and well adapted to dealing with our youth of today. This position requires a great deal of patience and quick thinking to solve problems encountered by our children while in school. I am also an excellent communicator and listener; two qualities that are essential in handling this position. I would consider a transfer to this position as a stepping stone to a well rounded career as a law enforcement officer.

Respectfully Submitted

S/Cpl. William P Babby III

A-91

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## DEPARTMENTAL INFORMATION

TO:      Michael J. Szczerba
         Chief of Police

FROM:    William P. Babby III
         Senior Corporal

DATE:    19 September 2005

RE:      Request for Transfer

Sir,

This writer is requesting a transfer to the position of "Evidence Detection Officer". I have reviewed the job task analysis form in Human Resource Division related to this position. I have been with the department for close to seventeen years now and have spent nearly my entire career in the Patrol Division.

 I have completed several college classes that directly relate to this position as well as attending several police related seminars over my years as a police officer. All documents are available for review in my personnel file located in the Human Resources Division.

Respectfully Submitted

S/Cpl. William P. Babby III

A-92

OFFICE OF PUBLIC SAFETY

DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

## DEPARTMENTAL INFORMATION

TO:       Michael Szczerba
          Chief of Police

FROM:     M/Cpl. William Babby
          Patrol Division

RE:       Request for Transfer

Sir,

This writer is responding to the posting for Traffic Investigator. I am requesting a transfer to the Traffic Division. I have been with the department for over 18 years, where I have spent this time in the patrol division.

I have been assigned to E platoon and have been the traffic investigator for the past 4 years. I feel that my time in patrol and my time as the traffic investigator qualifies me for the position of Investigator. I have been trained on radar and have received numerous other courses through out my career here with the Wilmington Department of Police. Thank you for your consideration.

Respectfully Submitted

M/Cpl. William Babby

3/10/07

3-10-07

3.10.07

3/21/07

A-93

**OFFICE OF PUBLIC SAFETY**
**DEPARTMENT OF POLICE**
**WILMINGTON, DELAWARE**

## MEMORANDUM

TO:        Capt. Bobby Cummings
           Commanding Officer
           Special Operations Division

FROM:      Capt. Michael E. Maggitti
           Commanding Officer
           Human Resources Division

DATE:      June 1, 2004

RE:        **REQUEST FOR TRANSFER**

The following officer has submitted a Departmental Information report requesting consideration for a position in the Special Operations Division.  Attached is the individual's  report.

S/Cpl. William P. Babby III

Your attention to this matter is appreciated.


MEM/mra


cc:     Posting file
        Personnel file

A-94

## OFFICE OF PUBLIC SAFETY

## DEPARTMENT OF POLICE

## WILMINGTON, DELAWARE

## MEMORANDUM

TO:     Capt. Gilbert Howell
             Commanding Officer
             Support Services Division

FROM:   Capt. Michael E. Maggitti
             Commanding Officer
             Human Resources Division

DATE:    May 26, 2005

RE:       **REQUEST FOR TRANSFER**

The following officers have submitted a Departmental Information report requesting consideration for a position in Support Services, as the Evidence Room Clerk.  Attached is the individuals report.

                      M/Cpl. Guillermo Santiago
                      S/Cpl. William Babby
                      S/Cpl. Christopher Vitale
                      Cpl. Dean Snyder  (2 request)
                      Cpl. Steven Parrott

Your attention to this matter is appreciated.

MEM/mra

cc:    Posting file
        Personnel file

A-95

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

**MEMORANDUM**

**TO:**        Capt.  James Jubb
                 Commanding Officer
                 Criminal Investigations Division

**FROM:**     Captain Michael Maggitti
                 Commanding Officer
                 Human Resources Division

**DATE:**     July 15, 2005

**RE:**        **REQUEST FOR TRANSFER**

The following officers have submitted Departmental Information reports requesting consideration for a position in the Forensics Services Division.  Attached are the individual reports.

                 Sgt. Joseph Sammons
                 S/Cpl. William Babby III
                 M/Cpl. Donald Bluestein

Your attention to this matter is appreciated.

MEM/mra

Cc:    Posting file
        Personnel file

A-96

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## MEMORANDUM

**TO:**         Capt. James Jubb
                 Commanding Officer
                 Criminal Investigations Division

**FROM:**     Captain Michael Maggitti
                 Commanding Officer
                 Human Resources Division

**DATE:**      September 8, 2005

**RE:**          **REQUEST FOR TRANSFER**

The following officers have submitted a Departmental Information report requesting consideration for a position in the Criminal Investigations Division. Attached is the individual's report.

| | |
|---|---|
| Sean Irons | E.D.U. & C.I.D. |
| Stephen Morrissey | C.I.D. |
| Johnny Saunders | C.I.D. & School Resource Officer |
| Sharnette Handy | School Resource Officer |
| Daniel Martinez | School Resource Officer |
| David Prado | School Resource Officer |
| Richard Evans | School Resource Officer |
| Joe Miller | School Resource Officer |
| William Babby | School Resource Officer |
| Diana Brown | School Resource Officer |
| David Hilliard Sr. | School Resource Officer |
| Jonathan Hall | School Resource Officer |

Your attention to this matter is appreciated.

MEM/mra

A-97

Cc:    Posting file
       Personnel file

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

**MEMORANDUM**

**TO:**       Capt. James Jubb
            Commanding Officer
            Criminal Investigations Division

**FROM:**     Captain Michael Maggitti
            Commanding Officer
            Human Resources Division

**DATE:**     September 22, 2005

**RE:**       **REQUEST FOR TRANSFER**

The following officers have submitted a Departmental Information report requesting consideration for a position in Evidence Detection Unit.  Attached are the individual's reports.

> S/Cpl. William Babby III
> S/Cpl. Robert Curry
> S/Cpl. David Hilliard Sr.
> Cpl. Jesse Russell
> Cpl. Steven Parrott
> Cpl. Johnny Saunders
> Ptlw. Sherri Vitale

Your attention to this matter is appreciated.

MEM/mra

Cc:     Posting file
        Personnel file

A-98

# OFFICE OF PUBLIC SAFETY
# DEPARTMENT OF POLICE
# WILMINGTON, DELAWARE

**MEMORANDUM**

**TO:**      Capt. Michael E. Maggitti
Commanding Officer
Special Operations Division

**FROM:**   Capt. Nancy S. Dietz
Commanding Officer
Human Resources Division

**DATE:**   March 19, 2007

**RE:**      **REQUEST FOR TRANSFER**

The following officers have submitted a Departmental Information report requesting consideration for a position in Special Operations Division. Attached are the individual reports.

| | |
|---|---|
| M/Cpl. William Babby | Traffic Investigator |
| M/Cpl. James Peiffer | Traffic Investigator |
| M/Cpl. Henry Cannon | Traffic Investigator |
| M/Cpl. Robert Johnson (2) | Traffic Investigator & WMD/Medical Training Coordinator |
| S/Cpl. Christopher Connelly Sr. | WMD/Medical Training Coordinator |
| S/Cpl. Gerald Connor Jr. | Traffic Investigator |
| S/Cpl. Arthur Gliem | Traffic Investigator |
| Cpl. Ralph Schfano | Traffic Investigator |
| Cpl. James Wyatt III | Traffic Investigator |

Your attention to this matter is appreciated.

NSD/mra

Cc:    Posting file
      Personnel file

A-99

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

**TO:**      **All Personnel**

**FROM:**    **Michael J. Szczerba**   *Michael J. Szczerba*
             **Chief of Police**

**DATE:**    **3 April 2001**

**RE:**      **Transfers & Assignments**

Effective Tuesday, 17 April 2001, the following transfers and assignments will become effective:

## CAPTAINS

Captain Sean Finerty is transferred from the Criminal Investigations Division to the Drug, Organized Crime and Vice Division.

Captain Victor Ayala is transferred from the Support Services Division to the Communications Division.

Captain Bobby Cummings is transferred from the Human Resources Division to the Special Operations Division.

Captain Gilbert Howell is transferred from the Administrative Division to the Support Services Division.

Lieutenant Donald Bowman is transferred from the Uniformed Services Division to the Criminal Investigations Division.

A-100

## LIEUTENANTS

Lieutenant Carol Senghaas is transferred from the Uniformed Services Division to the Communications Division.

Lieutenant Donald Bowman is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Lieutenant Clayton Smith is transferred from the Office of Professional Standards to the Criminal Investigations Division.

Lieutenant Robert Fox is transferred from the Office of Professional Standards to the Uniformed Services Division - A Platoon.

Lieutenant Carolyn Henry is transferred from the Office of Professional Standards to the Special Operations Division.

Lieutenant Robert Williams is transferred from the Uniformed Services Division - D Platoon to Uniformed Services Division - E Platoon.

Lieutenant Mitchell Rock is transferred from the Uniformed Services Division - D Platoon to Executive Officer in the Uniformed Services Division.

Lieutenant Bruce Mulrine is transferred from the Uniformed Services Division Riverfront to the Uniformed Services Division - C Platoon.

Lieutenant John Randolph is transferred from the Uniformed Services Division to the Uniformed Services Division - D Platoon.

Lieutenant Jerry Custis is transferred from the Uniformed Services Division to the Uniformed Services Division - B Platoon.

Lieutenant Christine Dunning is transferred from the Uniformed Services Division to the Human Resources Division.

Lieutenant Ruth Townsend is transferred from the Criminal Investigations Division to the Human Resources Division.

## SERGEANTS

A-101

M/Sergeant Angel Alverio is transferred from the Uniformed Services Division - D Platoon to the Drug, Organized Crime and Vice Division.

M/Sergeant Patrick Burke is transferred from the Uniformed Services Division - B Platoon to the Drug, Organized Crime and Vice Division.

M/Sergeant Thomas Spell is transferred from the Uniformed Services Division - D Platoon to the Criminal Investigations Division.

M/Sergeant Elmer Harris is transferred from the Uniformed Services Division - C Platoon to the Office of Professional Standards.

M/Sergeant Paul Reutter is transferred from the Uniformed Services Division - A Platoon to the Office of Professional Standards.

M/Sergeant James Gestwicki is transferred from the Uniformed Services Division - Traffic Unit to Planning Sergeant in the Human Services Division.

M/Sergeant John Snyder is transferred from the Uniformed Services Division to the Office of Public Information.

M/Sergeant John Fogelgren is transferred from the Uniformed Services Division - Executive Officer to the Uniformed Services Division - D Platoon.

M/Sergeant Gerald Murray is transferred from the Uniformed Services Division - C Platoon to the Uniformed Services Division - D Platoon.

M/Sergeant Steven Thomas is transferred from the Uniformed Services Division - E Platoon to the Uniformed Services Division - B Platoon.

M/Sergeant Corey Staats is transferred from the Uniformed Services Division - C Platoon to Operations Sergeant in the Uniformed Services Division.

M/Sergeant Thomas Kane is transferred from the Uniformed Services Division - B Platoon to Operations Sergeant in the Uniformed Services Division.

M/Sergeant Denise Bowers is transferred from the Uniformed Services Division - B Platoon to the Uniformed Services Division - E Platoon.

M/Sergeant William Wells is transferred from the Uniformed Services Division to the Special Operations Division.

M/Sergeant Jose Pacheco is transferred from the Criminal Investigations Division to the Uniformed Services Division - D Platoon.

Sergeant Robert Donovan is transferred from the Uniformed Services Division - C Platoon to the Criminal Investigations Division.

Sergeant Steven Barnes is transferred from the Criminal Investigations Division to the Office of Professional Standards.

Sergeant Steven Elliott is transferred from the Uniformed Services Division - E Platoon to the Office of Professional Standards.

Sergeant Thomas Dempsey is transferred from the Drug, Organized Crime and Vice Division to the Uniformed Services Division - C Platoon.

A-102

Sergeant Gregory Ciotti is transferred from the Uniformed Services Division - A Platoon to the Uniformed Services Division - C Platoon.

Sergeant Mark Lemon is transferred from the Criminal Investigations Division to the Uniformed Services Division - B Platoon.

Sergeant Sherri Tull is transferred from the Administrative Division to the Uniformed Services Division - B Platoon.

Sergeant Mayna Santiago is transferred from the Criminal Investigations Division to the Uniformed Services Division - C Platoon.

Sergeant Walter Ferris is transferred from the Criminal Investigations Division to the Uniformed Services Division - A Platoon.

Sergeant Kyle Rogers is transferred from the Uniformed Services Division - B Platoon to Operations Sergeant in the Uniformed Services Division.

Sergeant Robert Transue is transferred from the Uniformed Services Division to the Special Operations Division.

## CORPORAL/PATROL OFFICERS

Corporal Ronnie Howell is transferred from the Uniformed Services Division to the Special Operations Division.

Corporal Diana Brown is transferred from the Uniformed Services Division to the Special Operations Division.

Corporal Maurice Thompson is transferred from the Uniformed Services Division to the Special Operations Division.

Corporal William Babby is transferred from the Uniformed Services Division to the Special Operations Division.

Corporal Kenneth Jackson is transferred from the Administrative Division to the Special Operations Division.

Corporal Phyllis Johnson is transferred from the Administrative Division to the Uniformed Services Division - B Platoon.

Corporal Karen Buhrman is transferred from the Criminal Investigations Division to the Uniformed Services Division - D Platoon.

Corporal Donald Bluestein is transferred from the Uniformed Services Division Riverfront to the Uniformed Services Division - D Platoon.

A-103

Corporal Maureen Binkley is transferred from the Administrative Division to the Uniformed Services Division - E Platoon.

Corporal Paul McDannell is transferred from the Administrative Division to the Uniformed Services Division - D Platoon.

Corporal John Drysdale is transferred from the Criminal Investigations Division to the Drug, Organized Crime and Vice Division.

Corporal Thomas Looney is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Corporal Vincent DiSabatino is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Corporal Douglas Baylor is transferred from the Criminal Investigations Division to the Drug, Organized Crime and Vice Division.

Corporal Wildredo Campos is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Corporal Yvette Thomas is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Corporal Anthony Roundtree is transferred from the Uniformed Services Division to the Criminal Investigations Division effective 23 July 2001.

Corporal Chris Herrick is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Corporal Scott Chaffin is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Corporal Richard Brown is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Corporal Henry Law is transferred from the Uniformed Services Division to the Criminal Investigations Division - EDU.

Corporal Philip Jackson is transferred from the Uniformed Services Division to the Criminal Investigations Division - EDU.

Corporal Bruce Coffiey is transferred from the Uniformed Services Division - B Platoon to the Uniformed Services Division - C Platoon.

Corporal Robert Curry is transferred from the Drug, Organized Crime and Vice Division to the Uniformed Services Division - A Platoon.

A-104

Corporal Cynthia Dodson is transferred from the Uniformed Services Division - C Platoon to the Uniformed Services Division - A Platoon.

Corporal Henry Cannon is transferred from the Drug, Organized Crime and Vice Division to the Uniformed Services Division - D Platoon.

Corporal Thomas Harris is transferred from the Criminal Investigations Division to the Uniformed Services Division - D Platoon.

Corporal Stuart Walker is transferred from the Uniformed Services Division - C Platoon to the Uniformed Services Division - D Platoon.

Corporal Kathryn Gonzalez is transferred from the Uniformed Services Division - C Platoon to the Uniformed Services Division - D Platoon.

Corporal Anthony Johnson is transferred from the Uniformed Services Division - G Squad to the Uniformed Services Division - E Platoon.

Corporal Richard Iardella is transferred from the Criminal Investigations Division to the Uniformed Services Division - E Platoon.

Corporal James Ogden is transferred from the Uniformed Services Division - A Platoon to the Uniformed Services Division - F Platoon.

Corporal Donald Dempsey is transferred from the Uniformed Services Division - D Platoon to the Uniformed Services Division - F Platoon.

Corporal David Hilliard is transferred from the Uniformed Services Division - E Platoon to the Uniformed Services Division - F Platoon.

Corporal Alvin Boardley is transferred from the Uniformed Services Division - G Squad to the Uniformed Services Division - F Platoon.

Corporal Kevin Connor is transferred from the Human Resources Division to the Uniformed Services Division - F Platoon.

Corporal Vincent Knoll is transferred from the Drug, Organized Crime and Vice Division to the Uniformed Services Division - F Platoon.

Corporal John Burns is transferred from the Uniformed Services Division to the Uniformed Services Division - F Platoon.

Corporal Amy Rausch is transferred from the Criminal Investigations Division to the Uniformed Services Division - A Platoon.

Corporal Mary Jo Starobynski is transferred from the Criminal Investigations Division to the Uniformed Services Division - C Platoon effective 23 July 2001.

A-105

Officer Daniel Selekman is transferred from the Uniformed Services Division to the Special Operations Division.

Officer TaShawn Counts is transferred from the Uniformed Services Division to the Special Operations Division.

Officer Alfred Izquierdo is transferred from the Uniformed Services Division to the Special Operations Division.

Officer Sharnette Handy is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Officer Danny Silva is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Officer James Carrow is transferred from the Criminal Investigations Division to the Drug, Organized Crime and Vice Division.

Officer Brian Ritchie is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Officer Rodney Ross is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division effective 23 July 2001.

Officer Ronald Muniz is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Officer Anthony Easterling is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Officer Patrick Sandapen is transferred from the Criminal Investigations Division to the Drug, Organized Crime and Vice Division.

Officer Brian Witte is transferred from the Criminal Investigations Division to the Drug, Organized Crime and Vice Division.

Officer Andrea Janvier is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Officer Debbie Tymes is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Officer Matthew Hall is transferred from the Uniformed Services Division to the Criminal Investigations Division.

Officer Debra Donohue is transferred from the Uniformed Services Division to the Criminal Investigations Division - EDU.

A-106

Officer Michael Tuminaro is transferred from the Uniformed Services Division - C Platoon to the Uniformed Services Division - B Platoon.

Officer Kyle Kent is transferred from the Uniformed Services Division - B Platoon to the Uniformed Services Division - F Platoon.

Officer Scott Jones is transferred from the Uniformed Services Division - Sector Specialist to the Uniformed Services Division - C Platoon until 23 July 2001, at which time he goes to the Criminal Investigations Division.

Officer Everett Turner is transferred from the Uniformed Services Division to the Uniformed Services Division - F Platoon.

Officer George Collins is transferred from the Uniformed Services Division - A Platoon to the Uniformed Services Division - F Platoon.

Officer Kurtis Crawford is transferred from the Uniformed Services Division to the Uniformed Services Division - F Platoon.

Officer Porfirio Alequine is transferred from the Uniformed Services Division - E Platoon to the Uniformed Services Division - F Platoon.

Officer George Taylor is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division.

Officer Randy Pfaff is transferred from the Uniformed Services Division to the Drug, Organized Crime and Vice Division effective 23 July 2001.

A-107

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**   Michael J. Szczerba

*Michael J. Szczerba*
Chief of Police

**DATE:**   14 November 2001

**RE:**       **Transfers and Assignments**

**Transfers and Assignments**

On Thursday, 15 November 2001, at 0001 hours, the following transfers and assignments will become effective:

Patrolman Jeffery Silvers is transferred from E Platoon, Uniform Services Division to the Drug, Organized Crime, and Vice Division.

Patrolman Ronald Muniz is transferred from the Drug, Organized Crime, and Vice Division to E Platoon, Uniform Services Division.

A-108

MJS/sf/jfg

2001-148

**Office of Public Safety**
**Department of Police**
**Wilmington, Delaware**

## INFORMATIONAL BULLETIN

**TO:**     ALL PERSONNEL

**FROM:**   Michael J. Szczerba
            *Michael J. Szczerba*
            Chief of Police

**DATE:**   20 February 2003

**RE:**     **Transfers & Assignments**

Effective 0001 hours, Monday, 10 March 2003, the following transfers and assignments become effective:

 Lieutenant Jerry Custis is transferred from the Uniform Services Division and is assigned to the Special Operations Division.

Lieutenant Carolyn Henry is transferred from the Special Operations Division and is assigned to the Communications Division.

 Lieutenant John Snyder is transferred from the Office of Public Information and is assigned to the Uniform Services Division, B Platoon.

Master Sergeant Faheem Akil is transferred from the Drug, Organized Crime and Vice Division and is assigned to the Special Operations Division.

Master Sergeant Robert Emory is transferred from the Criminal Investigation Division and is assigned to the Drug, Organized Crime and Vice Division, Safe Streets Unit.

 Master Sergeant Elmer Harris is transferred from the Office of Professional Standards and is assigned to the Criminal Investigation Division, A Platoon.

A-109

**Transfers and Assignments**
**20 February 2003**
**Page 2 of 2**

Master Sergeant Michael Morrissey is transferred from the Uniform Services Division and is assigned to the Office of Professional Standards.

Master Sergeant William Wells is transferred from the Special Operations Division and is assigned to the Office of Public Information.

Sergeant Raymond Wyatt is transferred from the Criminal Investigation Division and is assigned to the Uniform Services Division, D Platoon.

Corporal Donna DiClemente is transferred from the Uniform Services Division and is assigned to the Criminal Investigation Division, A Platoon.

MJS/mem

2003-25

A-110

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**     Michael J. Szczerba

*Michael J. Szczerba*
Chief of Police

**DATE:**     Thursday, November 03, 2005

**RE:**       Promotions


The following Departmental Promotions are effective as of **0001 hours, Saturday, 29 October 2005:**

Gilbert R. Howell is appointed to the rank of Inspector;

Jerry L. Custis is promoted to the rank of Captain;

Faheem A. Akil is promoted to the rank of Lieutenant;

Amy L. Rausch is promoted to the rank of Sergeant;

**The following Departmental Promotion was effective and retroactive as of 0001 hours on Saturday, 20 August 2005:**

Donald A. Bluestein is promoted to the rank of Sergeant.


A-111

MJS/md/bem/als          - 1 -                                      2005-126

# OFFICE OF PUBLIC SAFETY
# DEPARTMENT OF POLICE
# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**      ALL PERSONNEL

**FROM:**    Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**    28 November 2005

**RE:**      Transfers & Assignments

**The following transfers and assignments are effective as of 0001 hours, Monday, 5 December 2005:**

Lieutenant Faheem Akil is transferred from the Special Operations Division and is assigned to the Uniform Services Division, E Platoon.

Lieutenant Robert Williams is transferred from the Uniform Services Division and is assigned to the Special Operations Division.

Master Sergeant Sherri Tull is transferred from the Uniform Services Division and is assigned to the Special Operations Division.

A-112

MJS/mem

2005-133

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       All Personnel

**FROM:**   Michael J. Szczerba

*Michael J. Szczerba*
Chief of Police

**DATE:**   9 December 2005

**RE:**        **Transfer Order**

A-113

Effective 0001 hours, Monday, January 9, 2006:

Master Sergeant Leon Stevenson is transferred within the Uniform Services Division from D to A Platoon.

Sergeant Joseph Sammons is transferred from the Uniform Services Division and is assigned to the Criminal Investigation Division (EDU).

Sergeant Debbie Donohue is transferred from the Criminal Investigation Division (EDU) and is assigned to the Uniform Services Division, D Platoon.

Sergeant Amy Rausch is transferred within the Uniform Services Division from D to E Platoon.

Sergeant Michael Rodriguez is transferred within the Uniform Services Division from E to A Platoon.

Officer Christopher Connelly is transferred from the Uniform Services Division, D Platoon and is assigned to the ~~Special Operations Division~~, (Community Policing Unit).   F- PLATOON

Officer Kimberly Donohue is transferred within the Uniform Services Division from E to C Platoon.

MJS/va/ddb                                    1                                    2005-150

Page 2
Transfers and Assignments

Officer Michael Duckett is transferred from the ~~Special Operations Division~~, and is assigned
to the Uniform Services Division, B Platoon. *F PLATOON*

Officer Thomas Esterling is transferred from the Uniform Services Division, B Platoon and is
assigned to the ~~Special Operations Division~~, (Community Policing Unit). *F PLATOON*

Officer Shawn Gordon is transferred from the Uniform Services Division, C Platoon and is
assigned to the ~~Special Operations Division~~, (Community Policing Unit). *F PLATOON*

Corporal David Hilliard is transferred from the Uniform Services Division, A Platoon and is
assigned to the ~~Special Operations Division~~, (Community Policing Unit). *F PLATOON*

Officer David Prado is transferred from the Drug, Organized Crime and Vice Division and
assigned to the Special Operations Division, (Community Policing Unit). *SAFE STREETS* *F PLATOON*

Officer Todd Riley is transferred from the Uniform Services Division, E Platoon and is
assigned to the ~~Special Operations Division~~, (Community Policing Unit). *F PLATOON*

A-114

MJS/za/ddb                    2                    2005-150

ME

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**      ALL PERSONNEL

**FROM:**   Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**   Tuesday, January 17, 2006

**RE:**      Transfers and Assignments                    A-115

**The following transfers and assignments are effective as of 0001 hours, Monday, January 30, 2006:**

Master Sergeant James Gestwicki is transferred from the Uniformed Services Division, "C" Platoon, to the Office of Professional Standards.

Master Sergeant Steven Barnes is transferred from the Office of Professional Standards, to the Uniformed Services Division "C" Platoon.

Corporal Malcolm Stoddard is transferred from the Uniformed Services Division, Community Policing Unit, to the Drug, Organized Crime and Vice Division, Operation Safe Streets Unit.

Patrol Officer Joshua Burch is detailed from the Uniformed Services Division, "B" Platoon, to the Drug, Organized Crime and Vice Division, Operation Safe Streets Unit. This detail will expire on June 5, 2006.

*Tabor, Santiago, George Collins From C To Pat*

*Villaverde to CID*

MJS/md/als 16.1.1 & 16.2.2          1 of 2                          2006-009

JUNE

**The following transfers and assignments are effective as of 0001 hours, Monday, June 5, 2006:**

Master Corporal John Lucey is transferred from the Human Resources Division, to the Uniformed Services Division.

Senior Corporal Albert Hicks is transferred from the Uniformed Services Division, "D" Platoon, to the Human Resources Division.

Corporal Stephen Brock is transferred from the Uniformed Services Division, "D" Platoon, to the Drug, Organized Crime and Vice Division, Operation Safe Streets Unit.

A-116

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**   Michael J. Szczerba
*Michael J. Szczerba*
Chief of Police

**DATE:**   Monday, February 27, 2006

**RE:**       Transfers and Assignments                          A-117

**The following transfers and assignments are effective as of 0001 hours, Monday, March 13, 2006:**

Uniformed Services Officer Vincent Jordan is **detailed** from the Uniformed Services Division, "C" Platoon, to the Community Policing Unit. This detail will expire on June 5, 2006.

Uniformed Services Officer Sean Connor is **detailed** from the Uniformed Services Division, "E" Platoon, to the Community Policing Unit. This detail will expire on June 5, 2006.

**The following transfers and assignments are effective as of 0001 hours, Monday, June 5, 2006.**

Uniformed Services Officer Jason Dolinger is **transferred** from the Uniformed Services Division, "A" Platoon, to the Community Policing Unit.

Uniformed Services Officer Corey Brown is **transferred** from the Uniformed Services Division, "E" Platoon, to the Community Policing Unit.

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**    Michael J. Szczerba

*Michael J. Szczerba*
Chief of Police

**DATE:**    Friday, 10 March 2006

**RE:**        Transfers and Assignments

**The following transfers and assignments are effective as of 0001 hours, Monday, March 20, 2006:**

Detective Master Corporal Ralph Hauck is transferred from the Criminal Investigations Division, and assigned to the Uniformed Services Division, "D" Platoon.

Corporal Michael Gifford is transferred from the Uniformed Services Division, Community Policing Unit, and assigned to the Criminal Investigations Division.

A-118

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**    Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**    Tuesday, July 11, 2006

**RE:**       Transfers and Assignments

**The following transfer and assignment is effective as of 0001 hours, Monday, July 31, 2006:**

Senior Corporal Stephen Morrissey is transferred from the Uniformed Services Division – "D" Platoon to the Criminal Investigations Division – "A" Platoon.

A-119

MJS/md/nsd/jtj/als Chapter 16                                      2006-099

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**      ALL PERSONNEL

**FROM:**    Michael J. Szczerba

Chief of Police

**DATE:**    Thursday, July 20, 2006

**RE:**      Transfers and Assignments

**The following transfer and assignment was effective as of 0001 hours, Monday, January 9, 2006 and is retro-active:**

Senior Corporal Chris Villaverde is transferred from the Special Operations Division – "F" Platoon to the Criminal Investigations Division – "B" Platoon.

A-120

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**    Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**    Tuesday, August 15, 2006

**RE:**       Transfers and Assignments

**The following transfers and assignments are effective as of 0001 hours, Tuesday, August 29, 2006:**

Sergeant Stephen Misetic is transferred from the Criminal Investigations Division – "A" Platoon, and assigned to the Uniformed Services Division – "A" Platoon.

Sergeant Porifirio Alequine is transferred from the Uniformed Services Division – "A" Platoon, and assigned to the Office of Professional Standards.

A-121

MJS/md/jlc/als-Chapter 16          Page 1 of 1                               2006-112

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**     ALL PERSONNEL

**FROM:**    Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**    Wednesday, September 20, 2006

**RE:**     Transfer and Assignment

**The following transfer and assignment is effective as of 0001 hours, Monday, September 25, 2006:**

Corporal George Pigford is transferred from the Uniformed Services Division – "F" Platoon to the Criminal Investigations Division.

A-122

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**    Michael J. Szczerba

Chief of Police

**DATE:**    Friday, November 10, 2006

**RE:**       Transfers and Assignments

**The following transfers and assignments will be effective as of 0001 hours, Sunday, March 11, 2007:**

Corporal George Collins is transferred from the Criminal Investigations Division, and assigned to the Uniformed Services Division.

Corporal Harvist E. Smallwood is transferred from the Uniformed Services Division "D" Platoon, and assigned to the Criminal Investigations Division.

Corporal Malcolm H. Stoddard is transferred from the Drug, Organized Crime and Vice Division – Operation Safe Streets Unit, and assigned to the Criminal Investigations Division.

Officer Robert F. Fox is transferred from the Uniformed Services Division, and assigned to the Drug, Organized Crime and Vice Division – Operation Safe Streets Unit.

A-123

Officer Michael E. Ballard is transferred from the Uniformed Services Division, and assigned to the Drug, Organized Crime and Vice Division – Operation Safe Streets Unit.

Corporal Stephen Brock is transferred from the Drug, Organized Crime and Vice Division – Operation Safe Streets Unit, and assigned to the Drug, Organized Crime and Vice Unit.

Corporal Heather B. Pierson is transferred from the Uniformed Services Division, and assigned to the Drug, Organized Crime and Vice Division.

Officer Hugh G. Stephey's detail to the Uniformed Services Division will end, and he will return to the Drug, Organized Crime and Vice Division.

A-124

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**      ALL PERSONNEL

**FROM:**   Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**   Friday, January 26, 2007

**RE:**      Transfers and Assignments

**The following transfer and assignment is effective as of 0001 hours, Monday, February 12, 2006:**

Corporal Edward Harrison is transferred from the Criminal Investigations Division, Forensic Unit to the Uniformed Services Division.

Corporal James Karschner is transferred from the Uniformed Services Division – "D" Platoon to the Criminal Investigations Division, Forensic Services Unit.

A-125

*M. AS,*

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**    Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**    Monday, 9 April 2007

**RE:**       Transfers and Assignments

**The following transfers and assignments will be effective as of 0001 hours, Monday, April 23, 2007:**

Master Corporal James Pfeiffer is transferred from the Uniformed Services Division "B" Platoon, and assigned to the Special Operations Division, Traffic Unit.

Senior Corporal Christopher Connelly is transferred from the Uniformed Services Division, Community Policing Unit, and assigned to the Special Operations Division, as the WMD – Medical Training Coordinator.

A-126

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**       ALL PERSONNEL

**FROM:**    Michael J. Szczerba

*Michael J. Szczerba*
Chief of Police

**DATE:**    Thursday, May 24, 2007

**RE:**       Transfers and Assignments – Uniformed Services Division

**The following transfers and assignments will be effective as of 0001 hours, Monday, June 18, 2007:**

Senior Corporal Michael Duckett is **detailed** from the Uniformed Services Division, "B" Platoon, to the Community Policing Unit. This detail will expire on September 4, 2007.

**The following transfers and assignments are effective as of 0001 hours, Monday, June 18, 2007.**

Patrol Officer Michael Fossett is **transferred** from the Uniformed Services Division, "D" Platoon, to the Community Policing Unit.

Patrol Officer Vincent McNally is **transferred** from the Uniformed Services Division, "A" Platoon, to the Uniformed Services Division, "B" Platoon.

Master Corporal Stuart Walker is **transferred** from the Uniformed Services Division, "D" Platoon, to the Uniformed Services Division "C" Platoon.

A-127

Senior Corporal David Jones is **transferred** from the Uniformed Services Division, "E" Platoon, to the Uniformed Services Division "C" Platoon.

Patrol Officer Caro Spearman is **transferred** from the Community Policing Unit, to the Uniformed Services Division "D" Platoon.

Master Corporal Kevin Connor is **transferred** from the Community Policing Unit, to the Uniformed Services Division "B" Platoon.

Senior Corporal Shawn Gordon is **transferred** from the Community Policing Unit, to the Uniformed Services Division "B" Platoon.

Corporal Fray Lynch is **transferred** from the Community Policing Unit, to the Uniformed Services Division "C" Platoon.

**The following new transfer date and assignment is effective 0001 hours, Monday May 28, 2007:**

Corporal George Collins is transferred from the Uniformed Services Division, "B" Platoon, to the Community Policing Unit. This Informational Bulletin rescinds the previous transfer date of 0001 hours on September 4, 2007.

A-128

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**        ALL PERSONNEL

**FROM:**   Michael J. Szczerba

*Michael J. Szczerba*

Chief of Police

**DATE:**    Wednesday, June 06, 2007

**RE:**        Transfers and Assignments – DOCV and DE Violent Crimes Task
Force

**The following transfers and assignments will be effective as of 0001 hours,
Monday, June 18, 2007:**

Detective Corporal Hector Cuadrado is assigned to the Delaware Violent Crime
Safe Streets Task Force.

Corporal Todd Riley is **transferred** from the Uniformed Services Division –
Community Policing Unit, and assigned to the Drug, Organized Crime and Vice
Division.

**The following transfer and assignment will be effective as of 0001 hours,
Monday, September 10, 2007.**

Senior Corporal Donald Cramer will be **transferred** from the Uniformed
Services Division, "B" Platoon, and assigned to the Drug, Organized Crime and
Vice Division.

A-129

# OFFICE OF PUBLIC SAFETY

# DEPARTMENT OF POLICE

# WILMINGTON, DELAWARE

## INFORMATIONAL BULLETIN

**TO:**    ALL PERSONNEL

**FROM:**    Michael J. Szczerba

Chief of Police

**DATE:**    22 January 2002

**RE:**    **Transfer Requests**

During the calendar year 2002, the Department anticipates openings for specialized assignments', agency-wide. Members are encouraged to examine their individual career objectives as they relate to specialized units within the Department. Members interested in a transfer to a specialized unit(s), should submit a Departmental Information Report for each position in which he/she is interested. This report should contain information such as the member's experience, education, knowledge, skills, and abilities required for the requested specialized assignment. Job descriptions are available for review in the Human Resources Division.

**All requests for transfer must be submitted through the chain of command. This will be the only advertisement for specialized assignments for the calendar year 2002, unless a new position is created. Prior transfer requests submitted before 1 January 2002 will not be considered. All requests for transfer are due by 22 February 2002.**

A-130

MJS/mem/jfg                                                                 2002-013

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIAM P. BABBY, III,    :
            :
   Plaintiff,     :
            :  C.A. No.  06-552 JJF
v.          :  TRIAL BY JURY DEMANDED
            :
CITY OF WILMINGTON   :
DEPARTMENT OF POLICE,  :
            :
   Defendants.    :

### CERTIFICATE OF SERVICE

I, Alex J. Mili, Jr., Esquire, hereby certify that on this 28th day of September, 2007, I electronically

filed the Appendix to Defendant's Opening Brief in Support of its Motion for Summary Judgment with the

Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and that these

documents are available for viewing and downloading from CM/ECF:

      Jeffrey K. Martin, Esquire
      Martin & Wilson
      1509 Gilpin Avenue
      Wilmington, DE 19806


      CITY OF WILMINGTON LAW DEPARTMENT


      /s/ Alex J. Mili, Jr.
      Alex J. Mili, Jr., Esquire (I.D. #4125)
      Senior Assistant City Solicitor
      Louis L. Redding City/County Building
      800 N. French Street, 9th Floor
      Wilmington, DE 19801
      (302) 576-2175
      Attorney for Defendant