IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM P. BABBY, III, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO. 06-552 JJF |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CITY OF WILMINGTON DEPARTMENT OF POLICE, | ) ) ) | |
| Defendants. | ) | |

## PROPOSED FINAL PRETRIAL ORDER

This matter comes before the Court at a final pretrial conference held pursuant to Rule 16, Federal Rules of Civil Procedure.

**Plaintiff's Counsel:**
Jeffrey K. Martin, Esquire
Timothy J. Wilson, Esquire
1508 Pennsylvania Ave
Wilmington, DE 19086
Telephone (302) 777-4681
Facsimile (302) 77-5803
jmartin@martinandwilson.com

**Defendant's Counsel:**
Gary W. Lipkin, Esquire
Assistant City Solicitor
Louis L. Redding City/County Building
800 N French St, 9th Floor
Wilmington, DE 19801
Telephone (302) 576-2175

I.  **Statement of the Nature of the Case:**

   **Plaintiff:**   This is a claim for injunctive relief and damages brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 USC. § 2000e et seq. Plaintiff was retaliated against by Defendant after Plaintiff filed a complaint against his supervisor as a result

of his supervisor's racially hostile and derogatory language. Plaintiff suffered various adverse employment actions following his complaint about his supervisor's racially hostile behavior.

**Defendant:**

**II.    Jurisdiction:**

The jurisdiction of this Court is founded on the existence of a question arising under federal statutes. In particular, this claim arises out of the anti-retaliation provisions of Title VII of the Civil Rights Act of 1991, 42 USC § 2000e.

**III.   Statement of Uncontroverted Facts:**

1. Plaintiff was hired as a recruit officer on or about January 9, 1989.

2. Plaintiff has been employed with Defendant, City of Wilmington Department of Police, for over eighteen years.

3. In or around the year 2000, Plaintiff began working under the supervision of Lieutenant Bobby Cummings in the Human Resources Division after being placed on light duty while recovering from surgery.

4. While working in the Human Resources Division, Plaintiff filled in for two different positions that were left vacant by other injured officers: the Extra-Duty Officer and the Training Officer. Plaintiff was praised numerous times for doing an excellent job by Captain Maggitti and Lieutenant Cummings.

5. Plaintiff was transferred into the Special Operations Division along with two junior officers in or around April of 2001.

6. Shortly thereafter, Plaintiff along with the two junior officers, Officer Izquierdo, an Hispanic officer, and Officer Tashawn Counts, an African-American officer, attended an Equal Housing Conference at the University of Delaware.

7. While at this conference, Sergeant William Wells, a direct supervisor of the three officers made an insensitive remark about the habits of Hispanics.

8. Plaintiff, along with Officers Izquierdo and Counts, approached Captain Cummings about this incident in or about May of 2001 and informed Captain Cummings that Sergeant Wells had made offensive remarks toward Puerto Ricans and Mexicans at the Equal Housing Conference.

9. Officer Counts informed Plaintiff and Officer Izquierdo without any explanation that he no longer wanted to proceed with a Complaint against Sergeant Wells.

10. Plaintiff and Officer Izquierdo filed a Complaint against Sergeant Wells which was assigned to Lieutenant Carolyn Henry, a friend of Wells, to investigate. Plaintiff and Officer Izquierdo complained to City Personnel about the delay in investigating the complaint against Sergeant Wells in order for the investigation to proceed.

11. The investigation of the Complaint took more than four months to complete.

12. Plaintiff and Officer Izquierdo were advised that Sergeant Wells was disciplined for his comments.

13. Sergeant Wells received only a written reprimand for his comments/actions.

14. Sergeant Wells was subsequently transferred to a position in the Chief's Office as the Department spokesperson.

15. Officer Counts who opted not to file a Complaint against Sergeant Wells remained in his position in the Crime Free Housing Division.

16. Plaintiff approached Captain Cummings and asked him why Officer Counts was chosen to remain in the Crime Free Housing Division while Plaintiff was assigned to street patrol duty.

17. In or around June of 2001, Plaintiff was officially assigned to F Platoon under the direction of Captain Marlyn Dietz and Lieutenant Mitchell Rock, both of whom are close friends of Sergeant Wells.

18. In or around the first week of September 2001, Plaintiff was called into Lieutenant Rock's office, along with Sergeant Corey Staats. Rock asked Plaintiff what his problem was and why he had not made any arrests or given out any tickets all summer.

19. Shortly after the meeting, Plaintiff and Officer Izquierdo were assigned together for street duty.

20. In or about October 2001, Plaintiff was once again called into Lieutenant Rock's office regarding an incident in the rear parking lot of the Department's gas station.

21. While Plaintiff was fueling his vehicle, Lieutenant Rock walked past him approximately fifty-sixty feet away, and entered the Police Staff garage. Rock said something to Plaintiff, but Plaintiff could not hear him so Plaintiff waved to Rock.

22. As Plaintiff was pulling out of the lot, Lieutenant Rock summoned him to his office on the police radio. When Plaintiff responded to Rock's office Rock asked Plaintiff what his problem was and why he "flipped [him] off." Plaintiff told Rock he did not flip him off; that he waved to him to acknowledge that he saw him, and told Rock that he could not hear what Rock had said to him.

23. In October 2001, Lieutenant Rock approached Plaintiff's soon-to-be supervisor, Sergeant Morrissey, and advised him that he should watch out for Plaintiff because Plaintiff is a "no good piece of shit."

24. In or around November 2001, Plaintiff was transferred back to the Patrol Division and assigned to street duties with E Platoon. After being transferred to the Patrol Division,

Plaintiff submitted a request through the proper chain of command to meet with the Director of Public Safety, James N. Mosely who maintained an open door policy.

25. In December 2001, Plaintiff was summoned by Captain Dietz who wanted to know why Plaintiff requested to meet with the Director of Public Safety.

25. Plaintiff was given permission to meet with the Director of Public Safety: the meeting took place in or around mid-December of 2001. In his meeting with Mr. Mosely, Plaintiff stated that he had been retaliated against for making a complaint against his supervisor and had been demoted for this.

26. During the meeting with the Director or Public Safety, Plaintiff presented a copy of the Department's transfer policy to the Director of Public Safety.

27. The Director of Public Safety advised Plaintiff that he would investigate his allegations and get back to Plaintiff. Plaintiff has yet to receive a response.

28. Plaintiff submitted a written request for a transfer out of the Patrol Division on or about February 21, 2002 and was once again denied without any supporting explanation.

29. On or about May 10, 2004, Plaintiff again submitted a written request for a transfer out of the Patrol Division. Plaintiff specifically requested to be returned to his day work position in the Special Operations Division. Captain Cummings advised Plaintiff that he was aware of his request and that he would "see what [he could] do."

30. Plaintiff requested another transfer in December 2005 to the position of Sector Specialist in F Platoon. However, his transfer request was subsequently denied.

31. F Platoon is a platoon in the Patrol Division of the Wilmington Police Department.

**IV.    Statement of Facts That Remain at Issue:**

1. Plaintiff has consistently received standard to superior performance evaluations during his entire time employed with Defendant, Wilmington Police Department most recently receiving a superior evaluation on or about September 14, 2004.

2. Plaintiff handled both the Extra Duty Officer position and the Training Officer position with virtually no training, and was praised numerous times, sometimes on a daily basis, by Captain Maggitti and Lieutenant Cummings, for doing an exceptional job fulfilling the duties of these positions. However, when Plaintiff submitted a written request for a permanent transfer to these positions, his request was denied. Defendant denies that these positions were vacant when Plaintiff applied for them.

3. On or about March 27, 2001, Plaintiff was approached by Cummings who had recently been promoted to Captain and was assigned to the newly-formed Special Operations Division as commander. Cummings asked Plaintiff to put in a transfer request to work in his division as a Crime Free Housing Officer.

4. Plaintiff complied with this request and submitted a one-line transfer request and was accepted into the division without listing any qualifications. Plaintiff was advised that the paperwork was "just a formality" to get him into the division.

5. While at the Equal Housing Conference a the University of Delaware, Sergeant William Wells a direct supervisor of the three (3) officers, made various racially insensitive and derogatory comments about "Puerto Ricans" and "Mexicans" in the presence of Plaintiff and Officers Izquierdo and Counts.

6. Captain Cummings attempted to dissuade Plaintiff and Officer Izquierdo from filing a formal complaint against Sergeant Wells and suggested they all meet to discuss and attempt to resolve the issue.

7. The meeting took place later that month, but Plaintiff and Officer Izquierdo were dissatisfied with the outcome and they requested that charges be filed against Sergeant Wells and that he [Wells] be disciplined for his actions.

8. The investigation took more than four (4) months to complete, and only after Plaintiff and Izquierdo complained to City Personnel about the delay was the investigation concluded.

9. Sergeant Wells was subsequently transferred to a position in the Chief's office as the Department spokesperson, while Plaintiff and Officer Izquierdo were demoted and transferred to the Special Operations Division, F Platoon Squad, and assigned to street patrol duties.

10. Plaintiff approached Captain Cummings and asked him why Officer Counts was chosen to remain in the Crime Free Housing Division while Plaintiff was assigned to street patrol duty, to which Captain Cummings responded, "Because I am the Captain and he [Counts] is my choice."

11. Shortly thereafter, Plaintiff was given an assignment by Lieutenant Rock wherein he was to park his patrol car in the 1200 block of West 6th Street, Wilmington, Delaware, and remain there for eight (8) hours every day with the exception of one (1) break. Plaintiff was advised that the purpose of the assignment was that his presence there would hopefully thwart and/or discourage the sale of drugs in that area by local drug dealers. Plaintiff was also instructed not to enforce any laws or make arrests; that his presence there alone would be enough to curb drug sales in that area. Plaintiff was assigned to this duty for the entire summer of 2001.

12. Upon his return from vacation in the summer of 2001, Plaintiff was once again assigned to the aforementioned task.

13. Plaintiff reminded Lieutenant Rock in Lieutenant Rock's office in September of 2001, that he was merely doing as he was instructed by Rock; that he was not to enforce any laws or make any arrests, but was there to curb the drug sales in the area. Rock called Plaintiff a "liar" and told him he had a "bad attitude." Rock also called Plaintiff "lazy" and told him that if he "didn't start putting out some numbers, [Rock would] transfer [Plaintiff] back to patrol [duty]."

14. Shortly after this meeting, Plaintiff and Officer Izquierdo were assigned together for street duty. At the end of that month, Plaintiff and Officer Izquierdo were the two (2) top producers of arrests and traffic tickets in their division.

15. Rock began shouting at Plaintiff and told Plaintiff that he (Rock) was his (Plaintiff's) boss and a lieutenant and that he (Rock) was free to discipline Plaintiff as he saw fit. Plaintiff told Rock that he did not have a problem with being disciplined if he did something wrong. Rock then dismissed Plaintiff from his office.

16. In or around October of 2001, Captain Dietz attended the daily roll call to discuss a new work schedule for F Platoon. Later that same day, Plaintiff and a few other officers were standing in the House Sergeant's office discussing the new schedule. Captain Dietz entered the room and joined in the discussion with the officers.

17. Shortly thereafter, Plaintiff was in the roll call room reviewing the overtime book when he was approached by Captain Dietz. Dietz stated to Plaintiff, "I hear you don't like the new schedule," to which Plaintiff responded in the affirmative, advising Dietz that he and the other officers did not like the new schedule because it was not very convenient to him or the other officers noting that the new schedule severely limited the amount of time they were going to be able to spend with their families. Dietz then left the room without comment.

18. Later that evening, Plaintiff was called into Lieutenant Rock's office. Rock advised Plaintiff that he was approached by Captain Dietz and was informed that Plaintiff approached Dietz to discuss the new work schedule without going through the proper chain of command. Plaintiff informed Rock that it was actually Dietz who initiated the conversation. Rock informed Plaintiff that the next time he spoke with Captain Dietz without going through the proper chain of command, Rock would write charges up against Plaintiff.

19. Near the end of October of 2001, Plaintiff was summoned by Captain Cummings and advised that he was being transferred back to the Patrol Division in November. When Plaintiff asked why he was being transferred back to this division, Cummings said that it was out of his hands and that Captain Dietz made the final decision.

20. In or around December of 2001, Plaintiff was summoned by Captain Dietz who wanted to know why Plaintiff requested to meet with the Director of Public Safety. Plaintiff informed Captain Dietz that it was a personal matter that he only wanted to discuss with the Director of Public Safety.

21. In or around December of 2001, Plaintiff was summoned by Captain Dietz who wanted to know why Plaintiff requested to meet with the Director of Public Safety. Plaintiff informed Captain Dietz that it was a personal matter that he only wanted to discuss with the Director of Public Safety.

22. Plaintiff was given permission to meet with the Director of Public Safety; the meeting took place in or around mid-December of 2001. In that meeting, Plaintiff informed the Director that he had been retaliated against for making a complaint against a supervisor and was demoted (transferred back to patrol), despite the fact that he was the senior officer, and most qualified officer, in his previous position.

23. Also during this meeting with the Director, Plaintiff presented a copy of the Department's transfer policy to demonstrate that he was the most qualified individual for the position and, according to policy, should have remained in that position. The Director told Plaintiff that he was not even aware that such a policy existed.

24. The Director also asked Plaintiff what other information he had to support his allegations. Plaintiff informed the Director that a fellow officer could support his claims.

25. From the time Plaintiff initially filed his complaint about Sergeant Wells, he began to experience "the cold-shoulder-treatment" from his superiors. Plaintiff soon found himself shut out by his supervisors; he has been virtually ignored on a daily basis. Plaintiff's superiors have continuously refused to even acknowledge that he is in the room or say hello to him in an elevator. In group conversations, Plaintiff is invariably not even recognized by his supervisors/superiors. Plaintiff has been experiencing the "cold-shoulder-treatment" daily throughout the remainder of 2001, all of 2002, 2003, 2004, and 2005 and this practice continues as of the filing of this action.

26. In total, Plaintiff submitted nine (9) transfer requests since 2002.

27. Plaintiff has routinely received standard to superior performance evaluations during his career with the City of Wilmington Police Department.

28. Captain Cummings tried to dissuade Plaintiff and Officer Izquierdo from filing a formal complaint against Sergeant Wells with respect to the alleged comments made by Sergeant Wells pertaining to Puerto Ricans and Mexicans.

29. The transfer to Spokesperson for the Chief's office was a promotion for Sergeant Wells.

30. In the summer of 2001, Plaintiff was given an assignment by Lieutenant Rock to simply sit in his patrol car on the 1200 block of W 6th Street, Wilmington, Delaware, and remain there for eight hours everyday with the exception of one break.

31. Plaintiff was instructed by Lieutenant Rock not to enforce any laws or make arrests while sitting in his patrol car in the 1200 block of W 6th St, Wilmington, Delaware.

32. Plaintiff was called into Lieutenant Rock's office and accused of approaching Captain Dietz to discuss the new work schedule without going through proper chain of command.

33. It was Captain Dietz who initiated this conversation about the new work schedule.

34. Plaintiff was warned by Lieutenant Rock that the next time he spoke with Captain Dietz without going through the proper chain of command, Lieutenant Rock would write up charges against Plaintiff.

35. Plaintiff was transferred to the patrol division in November and was told that Captain Dietz had made the final decision for this transfer.

36. When Mr. Mosely was presented with a copy of the Department's transfer policy, Mr. Mosley told Plaintiff that he was not aware that such a policy existed.

37. Mr. Mosely asked Plaintiff for other information supporting his allegations, and Plaintiff informed the Director that a fellow officer could support his claims.

38. Plaintiff was told that Mr. Mosely would investigate the allegations and get back to Plaintiff.

39. Plaintiff has experienced the "cold shoulder treatment" from his superiors, and has virtually been ignored on a daily basis from the day he filed the complaint against Sergeant Wells to this present day.

40. Plaintiff was demoted to F Platoon in retaliation for his complaint against Sergeant Wells.

41. Plaintiff was demoted to E Platoon in retaliation for his complaint against Wells.

42. Officer Counts would have been placed in F Platoon had he filed a complaint against Wells.

43. According to Defendants' policy the discipline for use of racial and derogatory comments is more than just a written reprimand.

44. It is not normal protocol for an investigation to begin four months after a complaint is filed.

45. It is not normal practice for an officer to be on the force for seventeen years and remain in patrol despite various requests to transfer to different positions.

46. Whether other officers with more seniority than Plaintiff are working as patrol officers.

47. Whether other officers also applied for each of the same transfers that Plaintiff applied for.

48. Plaintiff has been disciplined by the Office of Professional Standards for performance deficiencies.

49. The Extra Duty Officer position and the Training Officer position were not vacant when Plaintiff applied for them.

**V.    Statement of Issues of Law:**

The parties agree that there are issues of law pending in the summary judgment briefing.

**VI.    List of Pre-marked Exhibits:**

PX 1. Plaintiff's request for transfers to several positions submitted to Chief Szczerba

PX 2.   Responses from Chief Szczerba to Plaintiff's requests for transfer

Defendant reserves the right to object to PX 2 on the grounds that it is hearsay, if or when this document is identified with greater specificity.

PX 3.   Communications from Chief Szczerba to all Division Commanders concerning the 2002-4 Eligibility Lists for Promotions in Sections 6.78 and 7.1 of the Wilmington and FOP Lodge Number 1 Bargaining Agreement.

PX 4.   Copies of Wilmington FOP Lodge 1 Bargaining Agreement Section 6.78 and 7.1 on the harassment free work environment and conduct unbecoming an officer.

PX 5.   Employment performance evaluations of Plaintiff from 1994, 1997, 1999 and 2000 through 2004.

PX 6.   Correspondence from Lieutenant Mitchell Rock to Chief Szczerba regarding Plaintiff.

PX 7.   Article 17, Classification and Salaries

PX 8.   Plaintiff's tax returns and W-2's for years 2001 – 2007

Defendant reserves the right to object to PX 6 on the grounds that it is hearsay, if or when this document is identified with greater specificity.

DX 1.  Plaintiff's discipline log.

DX 2. Human Resource Division Transfer Memoranda.

DX 3. City of Wilmington Police Chief's Transfer Orders.

DX 4. City of Wilmington Police Department Agency Wide Transfer Memorandum

Plaintiff reserves the right to object to each of Defendant's proffered exhibits on the grounds of relevance and that the documents are hearsay. These documents must be identified with greater specificity.

**VII.  List of Witnesses:**

    A.    List of witnesses the plaintiff expects to call, including experts:

        1.    Expert witnesses: None

            a.  Stephanie Malleus, M.D., Plaintiff's family physician 1010 Bancroft Pwy, Wilmington, DE 19806, who will testify in accordance with medical records produced in this litigation.

            b.  Kamar T. Adeleke, M.D., Plaintiff's caridologist 614 Ferry Cut Off St, New Castle, DE, who will testify in accordance with medical records produced in this litigation.

        Defendant objects to these expert witnesses on the grounds that no export reports have been produced in accordance with Rule 26(b)(4).

        2.    Non-expert witnesses.

            a.  James M. Mosely, Director of Public Safety City of Wilmington, 300 N Walnut St, Wilmington, DE 19801.

            b.  Captain Bobby Cummings Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

            c.  Lieutenant Faheem Akil Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

            d.  Mitchell Rock, former Lieutenant Wilmington Police Department, 14 Westwood Blvd, Hockessin, DE 19707.

            e.  Lieutenant William Wells Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

   f. Sergeant Michael Morrissey Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

   g. Corporal Alfred Izquierdo Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

   h. Patrolman Tashawn Counts Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

   i. Karen Babby, wife of Plaintiff 2107 Lindell Blvd, Wilmington, DE 19808.

B. List of witnesses the defendant expects to call, including experts:

1. Expert witnesses.

Defendant reserves the right to identify rebuttal experts if Defendant will be permitted to call Stephanie Malleus, M.D. and Kamar T. Adeleke.

2. Non-expert witnesses.

   a. James M. Mosely, Director of Public Safety City of Wilmington, 300 N Walnut St, Wilmington, DE 19801.

   b. Captain Bobby Cummings Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

   c. Lieutenant Faheem Akil Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

   d. Mitchell Rock, former Lieutenant Wilmington Police Department, 14 Westwood Blvd, Hockessin, DE 19707.

   e. Lieutenant William Wells Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    f.    Sergeant Michael Morrissey Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    g.    Corporal Alfred Izquierdo Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    h.    Patrolman Tashawn Counts Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    i.    Karen Babby, wife of Plaintiff 2107 Lindell Blvd, Wilmington, DE 19808.

    j.    Chief Michael Szczerba, Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    k.    Captain Michael Maggitti Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    l.    Captain Marlyn Dietz Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    m.    Lieutenant Carolyn Henry Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    n.    Sergeant Corey Staats Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

    o.    Sergeant Michael Morrissey Wilmington Police Department 300 N Walnut St, Wilmington, DE 19801.

C.    **Rebuttal Witnesses.** Each of the parties may call rebuttal witnesses only in the event of "true surprise."

**VIII.    Statement of What Plaintiff Intends to Prove at Trial and Damages:**

      A.     Plaintiff will prove that he was retaliated against when he filed a complaint against Sergeant Wells for his racially insensitive and derogatory comments regarding Hispanic Americans. Plaintiff will show that he was demoted to street patrol following that and despite many requests to transfer from street patrol he remains in street patrol as a means of retaliation.

      B.     Damages: Plaintiff will testify about his economic losses as a result of his limited ability to work overtime due to a rotating shift that he has been working on for years. Plaintiff will also testify along with his physicians about the physical manifestations that have been caused by the work-induced stress as a result of defendants' retaliatory conduct.

**IX.   Statement of What Defendant Intends to Prove as Defense:**

Defendant will prove it did not retaliate against Plaintiff, that Plaintiff's transfer from one patrol assignment to another is not a demotion, and that denial of Plaintiff's transfer requests was not causally connected to his complaint about then-Sergeant Wells.

Defendant will prove that Plaintiff has not lost any income, economic opportunities nor has he incurred any stress as a result of rotation from one patrol assignment to another and/or not being given the transfer assignments of his choice.

**X.   Statements by Counterclaimants or Cross-claimants:**

Not applicable.

**XI.   Amendments to Pleadings:**

None.

**XII.   Certification of Two-Way Communication:**

The parties, by and through their undersigned counsel, have conferred but have been unable to resolve this matter through settlement.

**XIII.  Other Matters:**

None.

**XIV  Conclusion:**

This order shall control the subsequent course of the action unless modified by the Court to prevent manifest injustice.

DATED: _____

_____
UNITED STATES DISTRICT JUDGE

APPROVED AS TO FORM AND SUBSTANCE:

__/s/___ *Jeffrey K. Martin*_____
Jeffrey K. Martin, Esq.
Martin & Wilson, P.A.
1508 Pennsylvania Ave
Wilmington, DE 19806
(302) 777-4681
*Attorney for Plaintiff*

__/s/ *Gary W. Lipkin*_____
Gary W. Lipkin, Esq. (I.D. No. 4044)
City of Wilmington Law Department
800 N French St, 9th Floor
Wilmington, DE 19801
(302) 576-2175
*Attorney for Defendant*